[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiffs, the Winsted Land Development (WLD) and Ledgebrook, L.L.C. (Ledgebrook) commenced an action against the defendants, Kasper Associates, Inc. (Kasper) and Design Collaborative Architects, P.C. (DCA). The plaintiffs allege the defendants: breached written and oral contracts, breached a fiduciary duty and an express warranty of workmanship, committed CT Page 11168 malpractice, fraudulent concealment and negligent misrepresentation, and violated the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110 et seq.
Briefly stated, the dispute centers on the filling of approximately six acres of wetlands during the construction of a shopping plaza in Winchester, Connecticut, known as "the Shops at Ledgebrook." The issue presented is whether Kasper and/or DCA had the responsibility to notify WLD and Ledgebrook of the need to obtain and procure on their behalf United States Army Corps of Engineers (ACOF) and Connecticut Department of Environmental Protection (DEP) permits prior to the disturbance of wetlands.
The trial was held over twenty days from June 22, 1998, to September 11, 1998. The parties introduced both lay and expert testimony and 171 exhibits. From March to May of 1999, the parties filed post-trial briefs and proposed findings of fact.
 FACTS
From the credible evidence presented at trial, the court finds the following relevant facts. WLD is a partnership consisting of John Lombard, Robert Lombard and Frank Lombard. Ledgebrook is a limited liability company which is owned by three other limited liability companies. These three companies are owned by family members of John, Frank and Robert Lombard with John Lombard's children holding a majority interest. John Lombard is the manager of Ledgebrook, L.L.C., and, in this capacity, is aware of the day-to-day activities and makes business decisions necessary for its operation.
During all relevant times, Kasper was licensed in the state of Connecticut to perform land survey and professional engineering services. DCA is licensed to perform professional architectural services. Joseph Kasper is a licensed land surveyor and the principal in both Kasper and DCA.
In 1986, Kasper employed in excess of 100 persons. Kasper consisted of numerous departments, concentrating in land survey, civil engineering, structural engineering, environmental engineering, mechanical engineering, electrical engineering, traffic engineering and photo-grammetry. Kasper was marketed as a full-service, multi-disciplined firm. At all relevant times, Kasper was experienced in the development of commercial retail centers. Kasper and DCA held themselves out as licensed and CT Page 11169 competent engineers and architects.
John Lombard is currently employed as a real estate manager of commercial properties. He is licensed in the state of Connecticut as a real estate broker. Prior to this specific project, John Lombard's experience in real estate was limited to buying and selling apartment buildings. Frank Lombard, John Lombard's cousin, is an attorney with offices in Waterbury and Southbury. Frank Lombard's practice is concentrated in personal injury and workmen's compensation law. Robert Lombard, Frank Lombard's brother, is the owner of an automobile dealership in Winchester.
Prior to this project, the Lombards did not have experience with land use regulations or site development. They had not made applications to federal, state or local agencies regarding land use, including the ACOE or the DEP.
In 1985. approximately eighty-six acres of land located in close proximity to Robert Lombard's automobile dealership became available for purchase. This property had substantial frontage on Route 44, a state highway and thoroughfare. The southerly portion of the property is situated on Route 44 and is zoned for commercial purposes. A portion of the northerly section of the property is zoned for residential use. The Lombards negotiated a purchase price of $387,000 with a one-year option for one hundred dollars. The Lombards formed WLD, exercised the option, and purchased the property. Robert and Frank owned 25 percent and John owned the remaining 50 percent of WLD. WLD financed the purchase.
Initially, the Lombards were uncertain of the appropriate use of the property. As a result of their inexperience, the Lombards began discussions with several commercial developers concerning the sale of the site and other possible joint ventures. In addition, they consulted with Winchester town officials to ascertain the needs of the community. These officials expressed the need for a commercial shopping center. John Lombard conferred with individuals affiliated with the Finast food store chain about expanding its operations on the Winchester property.
In 1985, John Lombard had a meeting with Joseph Kasper and members of his staff. Joseph Kasper introduced himself as the president of Kasper and he advised Lombard his firm could provide comprehensive services for the development. Joseph Kasper told CT Page 11170 Lombard that his company had superior knowledge, skill and expertise in the development of shopping centers. Kasper's expertise included providing notice to clients of jurisdictional constraints and requirements of all governmental agencies and assisting in determining the need to obtain the necessary permits and approvals for a project. Since the Lombards had no experience in the development and construction of shopping centers, the prospect of Kasper providing all of the relevant services appealed to them.
One of Joseph Kasper's practices was to inform potential clients that he would use his firm's full resources to assist clients on their projects. Kasper also indicated that he was personally familiar with people associated with state regulatory agencies and that these contacts could be utilized to the client's advantage. Kasper recognized the Lombards were unsophisticated in the field of commercial development. Kasper performed professional services for WLD prior to a contract between the parties. Kasper made inquiries about the Winchester property and produced at least one contour map of the property, which map was dated December, 1985. (Plaintiffs' Exhibit 107.)
On January 17, 1986, Kasper and WLD entered into a contract. (Pls.' Ex. 11.) Cathyann Plumer, Kasper's director/landscape architect, signed the agreement as the agent of Kasper. In return for $32,200, Kasper agreed to perform a variety of professional services. The scope of the services are identified as "Task 1" and "Task 2" of the agreement. Task 1 provided, in relevant part, for the preparation of a topographical map and the field marking and survey of wetland soils. Kasper did not have a soil scientist on its staff. Accordingly, the agreement indicated Kasper's fee included the cost of procuring professional services from outside sources. Task 2 provided for a feasibility study to include in part the preparation of a site analysis map and site schematics for both residential and commercial developments. Task 2 also required Kasper to review its development conclusions with WLD.
The purpose of a feasibility study is to ascertain the suitability of a piece of property for an intended project. Included within this study is the identification of the property's physical constraints and the determination of the required governmental approvals and permits. A site analysis map is prepared during the study. This document depicts the constraints on the property — i.e., zoning, topography and wetlands. At no time did Kasper notify WLD that its research CT Page 11171 would not address the ACOE and DEP permits.
Plumer left Kasper shortly after the 1986 agreement was executed. She was replaced by James Swift who became the project manager assigned to WLD. In this capacity, Swift provided site design and project management services and he coordinated the work of Kasper's site planning professionals.
In site planning, a team of professionals includes architects, engineers and surveyors. Their role is to design a project which meets the needs of the client and addresses the constraints of the particular site. From 1986 to 1990, these site planners interacted with municipal, state and federal agencies regulating land development.
In 1985, Swift became licensed as a landscape architect. Joseph Kasper was not personally involved in the project on a day-to-day basis. Swift played no role in the project prior to the January 17, 1986, agreement; thus, he was not aware of the initial discussions between Kasper and WLD.
Joseph Kasper encouraged his professional staff to market the firm. In accordance with this policy, Swift marketed Kasper as a full service organization capable both of site surveys and construction design. In those instances in which a client required a service that Kasper could not provide, Swift would advise the client such service could be subcontracted out or, in the alternative, the client could make its own arrangements to secure the same.
As a landscape architect and land development professional, Swift was aware clients often relied on him for his technical guidance and his knowledge of government regulations and permit requirements. At trial, Swift acknowledged the services provided by an engineer, surveyor or site planner often varied depending on the clients' level of sophistication. He knew that WLD was not sophisticated in land development. As Kasper's project manager, it was Swift's responsibility to obtain the necessary permits for the WLD project as designed.[1] Swift testified at trial that "any permits that . . . [Kasper] knew of that were needed for the shopping center, we would have pointed them out to the client." (Transcript, Aug. 4, 1998, p. 84).
From the earliest stages of the project, it was readily apparent there existed a substantial number of acres of wetlands CT Page 11172 on the site. Wetlands are a valuable natural resource primarily because they provide food and habitat for wildlife and a natural water storage area during floods and storms. Wetlands also purify water not only by filtering and removing pollutants, but also by assimilating and recycling them. (Pls.' Ex. 103.) Landscape architects and other design professionals are concerned about the environment and preserving wetlands. Wetlands are regulated by numerous government agencies to include the ACOE, DEP, and municipal inland wetlands commissions.
The ACOE and the DEP require those who desire to disturb wetlands to apply for a permit. Failure to comply with that requirement may result in civil or criminal penalties. The federal and state definitions of wetlands are not identical. A state wetland is identified as poorly and very poorly drained soils and all alluvial soils. A federally designated wetland has three characteristics: (a) hydric soils; (b) the presence of wetland vegetation; and (c) wetland hydrology. In approximately. 50 percent of the cases, the boundaries of federal and state wetlands are virtually identical; in the remaining 50 percent, boundaries of federal and state wetlands match to a lesser degree.
The ACOE issues two types of permits: a nationwide permit for one to ten acres of wetlands disturbance and an individual permit for a disturbance of more than ten acres.[2] The ACOE requires applicants to avoid, minimize and mitigate wetland disturbance. In 1986, a DEP 401 water quality certificate was required if wetlands disturbance was more than one acre. At trial, Swift indicated that Kasper could have investigated and obtained the permits utilizing either Kasper's own staff or hiring outside professionals. (Tr., Aug. 4, 1998. pp. 12-14.) At no time during his employment with Kasper from 1977-1997 did Swift ever receive any formal training in ACOE or DEP permit procurement.
In 1986, Swift was aware the ACOE was a federal regulatory body. At this time, he had not personally applied for an ACOE permit but he had assisted co-workers in obtaining an ACOE permit to build a structure within the waterline of a river.
A soil scientist field locates and flags wetlands on a site. Based on those findings, a surveyor prepares maps depicting the wetlands and determines the wetlands acreage. In the spring of 1986, Kasper hired Joyce Raabe, a certified soil scientist in this state, to locate state delineated wetlands at the project CT Page 11173 site. She was retained in accordance with the terms of the January 17, 1986, agreement.
From January, 1986, to approximately April, 1986, work progressed in accordance with the parties' contract. After approximately 25 percent of the funds was exhausted on the Task 2 feasibility study, WLD decided to pursue commercial as opposed to residential development of the site. The project entered the next stage which included project design and procuring of the necessary governmental permits and approvals. Although the feasibility study had already identified the desired use of the property, WLD never instructed Kasper to discontinue project research or to conclude its site analysis.
In May of 1986, a meeting was held in Kasper's office. Numerous Kasper site planning personnel made presentations concerning two alternative proposals for a retail commercial development. The feasibility of two facilities, one with 130,000 square feet and the other with 200,000 square feet, was discussed. Each facility would provide retail space for the Finast grocery store and other retail shops. State and municipal permits were discussed, including permits from the State of Connecticut Traffic Commission (STC), the Winchester Planning 
Zoning Commission (WPZC), and the Winchester Inland Wetlands Commission (WIWC).
The two proposals were set forth in a memorandum from Swift to John Lombard dated May 2, 1986. (Pls.' Ex. 12.) Swift proposed that Kasper be compensated on an hourly basis for its work in developing the two alternatives for submission to the planning and zoning commission. WLD decided to proceed with the 200,000 square foot proposal which included a large department store. This 200,000 square foot facility was to become "the Shops at Ledgebrook." It was recognized that the larger facility would necessitate the filling and disturbance of acres of wetlands and the blasting and removal of a substantial quantity of rock ledge.
Kasper prepared, filed and presented an application to the WPZC for site plan approval and to the WIWC for permission to fill six acres of wetlands. Swift and other Kasper employees were aware that six acres represented a substantial area of wetland filling. Kasper also secured STC approval for the shopping center. On May 21, 1986, and June 4, 1986, Swift appeared before the WIWC to present an application for inland wetland approval. (Pls.' Ex. 102; Defendants' Ex. 4.) CT Page 11174
On the day of the May 21, 1986, meeting, Raabe met with Swift. Raabe, who had identified approximately ten acres of wetlands at the site, had been instructed to meet with Swift and to deliver a prepared worksheet concerning the wetlands on the site, presumably for use during Swift's presentation to the inland wetlands commission. Raabe prepared a brief memo to Swift and the worksheet. (Pls.' Ex. 70). She informed Swift her report was not complete and that Ledgebrook would require an ACOE permit. Swift responded that no ACOE permit was necessary. After this encounter, Raabe had no further contact with Swift or the Ledgebrook project. During this period of time, Swift informed WLD that Kasper had obtained all permits.
The WIWC approved the filling of six acres of wetlands. (Defs.' Ex. 4.) The site plans submitted for the WIWC approval included both the 130,000 square foot and the 200,000 square foot proposals. At the time the municipal permits were sought, Kasper suggested WLD retain a local attorney to attend the WPZC meetings. Attorney Richard Lavieri was so retained.
Though Lavieri attended the June 1986 meeting and made his presence known to the members of WPZC, it was Swift who presented the WLD application to the Commission. Following the Winchester approvals, Lavieri spoke to members of the Barkhamsted Inland Wetlands Commission and arranged for the matter to be placed on that commission's agenda. Lavieri was in attendance when the application was presented and approved by the Barkhamsted Inland Wetlands Commission.
Thereafter, Lavieri arranged to have the WLD application rescheduled before the WPZC in order to present the Barkhamsted approval. Lavieri did not provide legal advice to WLD or Kasper concerning the ACOE or DEP permits required for the Ledgebrook project. Moreover, Lavieri had no prior experience in obtaining ACOE and DEP permits for wetland filling.
Swift reviewed Winchester's regulations in connection with the preparation of the WLD inland wetlands application. (Pls.' Ex. 100). Section Eight of the Winchester regulations, entitled "Other Permits and Licenses," provides as follows: [n]othing in these regulations shall obviate any requirement for the applicant to obtain any other assent, permit or license required by law or regulation by the Government of the United States or of the State of Connecticut or any other political subdivision thereof. The CT Page 11175 obtaining of such assents, permits or licenses is solely the responsibility of the applicant." Swift had prior experience in reviewing municipal inland wetland regulations, and section eight of the Winchester regulations was a common provision in municipal regulations at that time.
The WPZC approved the 200,000 square foot commercial development proposal. The WIWC approved the filling of six acres of wetlands subject to two conditions: the approval of the town of Barkhamsted Inland Wetlands Commission and the hiring of an individual to monitor soil erosion control measures required during construction. (Defs.' Ex. 4.) WLD retained Swift to monitor soil and sedimentation control barriers. In this capacity, Swift frequently visited the work site to perform his inspections.
In September 1986, Frank Lombard participated in obtaining approval from the Winchester Water Pollution Control Authority for connection of the Ledgebrook sewer line into the municipal sewer system. (Defs.' Ex. 7.) Frank Lombard had no previous experience obtaining land use permits from federal, state or municipal authorities.
Swift and other Kasper employees prepared numerous documents including site plans in connection with the permit applications. Although the parties' written agreement did not expressly obligate Kasper to pursue planning and zoning, inland wetland or STC permits, Kasper nevertheless obtained the permits and WLD paid for these services.
On December 18, 1987, WLD accepted Kasper's December 10, 1987, proposal to provide construction design services for the Ledgebrook project. The design was to consist of a 51,230 square foot supermarket, a 70,770 square foot area for retail stores, and a 67,000 square foot department store.[3] Under the contract, Kasper was to provide architectural, engineering and contract administration services. Compensation was by lump sum except for contract administration services which were to be paid on an hourly basis.
Approximately six months later, WLD entered into a contract with DCA dated June 7, 1988, to provide professional architectural and engineering services for the Ledgebrook project. The contract form is entitled "AIA Document B1-41, Standard Form of Agreement Between Owner and Architect." This CT Page 11176 American Institute of Architects (AIA) form contract was utilized by the parties as a substitute for the December 10, 1987, agreement because it was required by WLD's lenders who were financing the project. The AIA contract provided in part that "[t]he Architect shall assist the Owner in connection with the Owner's responsibility for filing documents required for the approval of governmental authorities having jurisdiction over the Project" (Pls.' Ex. 15, Article 2, § 2.4.4.)
The December 10, 1987, contract provided for lump sum payments to DCA for professional services rendered.[4] On at least one occasion, DCA informed WLD of developments in government regulations affecting the property. (Pls.' Ex. 94.) WLD retained Mark Gauger to act as its construction manager for the Ledgebrook project.
Kasper prepared a June 10, 1988, document detailing site improvement specifications for "the Shops at Ledgebrook." The site work specifications included sire clearing, rough grading, finish landscaping, paving, storm drainage and sanitary sewage systems. (Pls.' Ex. 76.)
WLD initially hired DM Construction Company of Torrington (DM) to perform the site work. The contract price was $2,227,000, but the price was increased to over $4 million due to contract change orders. A substantial portion of the change orders related to site work performed on Phase II. The DM contract required blasting, crushing and removing of a substantial quantity of rock, site grading and other site work.
DM began site work in late 1988. As the site work progressed, WLD became dissatisfied with DM's performance and it hired other contractors to perform portions of the site work. The site work continued while the buildings were being constructed. In August of 1988, Swift returned to the WIWC to address sanitary and water service encroachments into wetlands. (Pls.' Ex. 79.)
The town of Winchester issued a certificate of occupancy in September, 1989. The Finast supermarket opened on or about September 16, 1989. The landscaping work was incomplete when the certificate of occupancy was issued. At the time of trial, Phase II was still not complete; finish grading, utility installation, paving, and landscaping remained. Throughout the project, there were frequent meetings and numerous communications between Swift, other Kasper representatives, WLD and construction contractors. CT Page 11177
At a September 1, 1988, job meeting, Robert Lombard expressed an opinion that "the site work is completed." (Defs.' Ex. 11.) Robert Lombard testified at trial that he meant the rough site work was completed. The site work continued beyond September 1, 1988, and progressed simultaneously with the construction of the buildings.
Swift was frequently present on the site and continued to act as project manager and soil erosion control officer. In his latter role, it was his duty to inspect, and verify proper installation of the filter fabric silt fence. It was also his responsibility to insure that no mud or other debris entered into the wetlands and watercourses.
After 1990, portions of the silt fence were buried as a result of the substantial wetland filling. The. actual filling of the wetlands amounted to approximately 6.65 acres; that amount exceeded the WIWC's approval of six acres. Winchester took no action as a result of the overfilling. Approximately five acres of the filling took place in the Phase II portion of the site.
At trial, Swift initially testified at the time of the project, his knowledge of ACOE jurisdiction was limited to coastal wetlands and large waterways. However, on cross-examination, he admitted his awareness of ACOE jurisdiction was greater than he had disclosed. During the course of the project, Swift casually mentioned to the Lombards that the ACOE might have an interest in the site; he never researched this important information nor did he ever specifically advise the Lombards of the importance or applicability of ACOE jurisdiction. (Tr., Sept 9, 1998, afternoon session, pp. 28-31.)
Swift testified "I think I recall stating [to the Lombards] that we hadn't researched the permits, and hadn't done due diligence on what permits would be required." (Tr., Sept. 9, 1998. afternoon session, p. 20.) Neither Swift nor any other Kasper representative ever determined whether an ACOE permit was required. Swift never advised the Lombards that Kasper could investigate the need for the permit for additional compensation. He justified this in stating, "It was not our task." (Tr., Sept. 9, 1998, afternoon session, p. 31).
Glen Terk, a licensed attorney in this state, was retained by WLD to provide legal services in obtaining financing for the CT Page 11178 Ledgebrook Plaza from the Crown Life Insurance Company of Toronto, Canada; as such, he submitted to the lender an opinion letter dated March 12, 1990, with numerous attachments. (Pls.' Ex. 105.) Included within the documents submitted were numerous representations, one of which was that WLD did not need an ACOE permit for the project. (Pls.' Ex. 105, sec. III-B.) One such representation provided, "[t]he Borrower's statement certifies that the Project will not involve the dredging or filling of surface waters or the discharge of any dredge or fill matter into the waters of the United States. Accordingly, it is our opinion that a Section 404 permit from the [ACOE] is not required for the project." (Pls.' Ex. 105, Section III-B.)
In preparing these documents, Terk relied not upon WLD as a source of technical information, but upon representations made by a Kasper representative during a telephone conversation. Terk did not seek written confirmation because he believed Kasper to be a reputable company.
In the summer of 1993, Great Island Development Company, on behalf of Wal-Mart Stores (Wal-Mart), made an inquiry concerning the purchase of Phase II of the project. Kasper provided to Wal-Mart written materials which included engineering documents pertinent to Phase II. WLD entered into purchase negotiations with Wal-Mart and numerous draft agreements passed between them. As provided by the agreements, Wal-Mart made several $3000 payments to extend the 120-day term of the contract and closing dates. In August of 1994, Wal-Mart and WLD executed a purchase and sale agreement for the Phase II portion of Ledgebrook for an agreed upon price of $3 million. (Pls.' Ex. 17.)
The agreement contained two important provisions. First, WLD was required to provide Wal-Mart with all the permits and approvals for the wetland filling. Second, Wal-Mart was to obtain front an existing tenant, Rite-Aid Pharmacy (Rite-Aid), a release of that tenant's exclusive right to operate a pharmacy at Ledgebrook.[5] Rite-Aid agreed to release its exclusive right in return for which WLD would pay $800,000 and to construct a stand-alone pad store for Rite-Aid's use. WLD would retain ownership of the store and Rite-Aid would pay rent.
To consummate the transaction with Wal-Mart, WLD was obligated to pay a $200,000 sales commission. During negotiations, Wal-Mart informed WLD that the ACOE and DEP permits required for the filling of wetlands were missing. When the CT Page 11179 Lombards inquired of Swift regarding these permits, he indicated that these permits were not necessary.
After numerous discussions between WLD and Kasper, the two parties decided to apply for a nationwide wetland permit and a DEP 401 water quality certificate. The law firm of Pullman 
Comley in Bridgeport was retained to assist in obtaining these permits.[6] (Pls.' Ex. 20.) There was no written agreement between the parties covering these professional services. However, the work was performed and WLD paid for the legal services.
Both the ACOE and the DEP rejected the applications for after-the-fact permits. (Pls.' Ex. 23, 24.) In rejecting the permits, both agencies stressed the negative impact wetland filling had on the site. Specifically, the ACOE indicated, "[i]f we had had the opportunity to review your project prior to construction we would have discussed avoiding and minimizing the wetland fill areas along Route 44 . . . [w]e are concerned with impacts to Mallory Brook and adjacent wetlands, which provide valuable functions such as flood storage, water quality renovation, and wildlife habitat." (Pls.' Ex. 23). The DEP stated "[t]he loss of 6.65 acres of wetlands at the site is unacceptable" and "[a]n experienced, qualified environmental consultant should be retained. . . ." (Pls.' Ex. 24.)
The ACOE, by letter dated February 3, 1995, notified WLD the filling of federal wetlands in violation of section 404 of the Clean Water Act could result in the imposition of criminal and civil penalties. (Pls.' Ex. 21.) Although WLD had informed the ACOE in its after-the-fact permit application that 6.65 acres had been filled, the ACOE expressed concern about only 1.37 of these acres. The ACOE's determination was based largely upon the identification of visible federal wetlands on the southern portion of the site running along Route 44 and adjacent to Mallory Brook.
The wetlands in the northern portion of the Phase II site were destroyed by the substantial filling. These wetlands were no longer visible without excavating test pits. It is probable that an inspection of the Ledgebrook site prior to the filling would have disclosed a greater number of federal wetlands. Because the ACOE's concern was limited to only 1.37 acres, WLD decided not to challenge the ACOE's determination. CT Page 11180
In a letter dated April 4, 1995, Wal-Mart notified WLD of its intention to exercise the right to extend the term of the contract to August 26, 1995, and it paid $3000 for that extension. (Defs.' Ex. 21.) During that time, WLD successfully negotiated the release of the Rite-Aid's exclusive right to operate a pharmacy. WLD never obtained the ACOE and DEP permits.
In the fall of 1995, Wal-Mart secured a site for its store in Torrington, Connecticut, and that site is now completed. WLD terminated the services of Kasper and DCA. (Defs.' Ex. 18.) In September 1995, WLD conveyed the portions of the property earlier identified as Phase I and Phase II by quitclaim deed to Ledgebrook.
At the time of trial, WLD was an existing business entity. WLD and its successor in title, Ledgebrook, have tried unsuccessfully to market the Phase II portion of the property. Wal-Mart had expressed renewed interest in the Phase II portion of the site for a proposed sale price of $1,817,000. Under this proposal, Ledgebrook would not be obligated to pay a broker's fee. This sale cannot be completed, however, because Ledgebrook can longer provide Wal-Mart a release of Rite-Aid's exclusive pharmacy rights.
Ledgebrook retained Leonard Engineering to assist Pullman 
Comley in Ledgebrook's efforts to obtain the ACOE and DEP permits. By letter dated May 31, 1996, the ACOE granted a nationwide permit for Ledgebrook. (Pls.' Ex. 33.) That authorization was made contingent upon the performance of certain remedial work, the cost of which would be approximately $20,000. The ACOE additionally mandated a DEP 401 water quality certificate be obtained. At the time of trial, the DEP permit application was pending. It is probable that this permit will be obtained in the near future.
Leonard Engineering has billed $11,416 and Pullman Comley $5300 for professional services rendered in connection with the after-the-fact permits. John Lombard's opinion is that the fair market value of the Phase II property without final permit approvals is $500,000. WLD and Ledgebrook have spent approximately $15 million on the development of the Ledgebrook Shopping Plaza, which was intended to be a 200,000 square foot building. As built, the structure is 101,000 square feet and there is an additional 4,000 square foot pad site leased to a bank. CT Page 11181
Approximately $1.5 million was paid to D M for Phase 2 site work. At the time of trial, site work on Phase II had not been completed. (Pls' Ex. 111.) These funds would not have been expended if WLD had known that the Phase II portion of the site could not be leased or sold.
There was expert testimony that a feasibility study conducted by a site planner requires the evaluation of the applicability of governmental land use regulations and permits to include ACOE and DEP permits. The duty of care owed to a client regarding the identification of wetland permit requirements was the same for all site planning professionals. The prevailing standard of care among site planning professionals required that they advise their clients of these constraints and permit requirements and of the potential consequences of not complying with ACOE jurisdiction. A reasonable and prudent site planning professional would be aware of the need to investigate and address wetland permit requirements.
There was further expert testimony that it is a deviation of the standard of care for site planning professionals not to be aware of the existence of the ACOE and its jurisdiction over inland wetlands. At all relevant times, information concerning the ACOE's jurisdiction over wetlands was available to the public from a variety of sources; i.e., publications prepared by the ACOE, notices in the Federal Register, public notices placed in newspapers, and informational mailings to municipalities and individuals. (Pls' Ex. 77, 102, 104.) Information was also available from the DEP, public libraries, and by direct contact with ACOE in Waltham, Massachusetts.
Expert testimony established the prevailing standard of care requires a site planning professional to convey to the client information learned from a soil scientist regarding the need for an ACOE permit. A site planning professional has a continuing duty to be aware of land use regulations and to advise the client of these regulations throughout the entire period of the project.
 DISCUSSION STANDING
Although the defendants did not allege standing as a special defense, both parties briefed the issue in their post-trial CT Page 11182 memoranda. Therefore, the court will address the issue. "Standing is the legal right to set judicial machinery in motion. One cannot rightfully invoke the jurisdiction of the court unless he has, in an individual or representative capacity, some real interest in the cause of action, or a legal or equitable right, title or interest in the subject matter of the controversy."Lawrence Brunoli, Inc. v. Branford, 247 Conn. 407, 411,722 A.2d 271 (1999).
The contracts entered into were between WLD, Kasper and DCA. In September, 1995, WLD conveyed a portion of the property to Ledgebrook by quitclaim deed. The property conveyed includes the areas referred to as Phase I and Phase II. Ledgebrook is a successor in title to WLD. The plaintiffs filed their initial complaint in 1996. Both plaintiffs claim damages as a result of the defendant's alleged conduct.
At the time of trial, WLD was an existing business entity and Ledgebrook was an existing limited liability company. Both WLD and Ledgebrook are Lombard family business ventures. In view of the fact that WLD and Ledgebrook have real interests in their causes of action, the court finds the plaintiffs have standing.
 Counts One Two — Breach of Contract
In counts one and two of the amended complaint dated May 23, 1998, the plaintiffs allege the defendants breached both written and oral contracts. The plaintiffs contend these contracts obligated the defendants to obtain and/or provide notice of the need to obtain all necessary government permits and approvals. Specifically, the plaintiffs allege an ACOE permit and a DEP 401 water quality certificate were required as a result of the filling and disturbance of a substantial area of wetlands. The defendants contend the contracts were not executed by the parties. (Defs.' Eighth Special Defense.)
In order to ascertain the totality of the contractual obligations created by the parties, the court is required to evaluate written documents, verbal representations and the parties course of conduct. "Contracts may be express or implied. These terms, however, do not denote different kinds of contracts, but have reference to the evidence by which the agreement between the parties is shown. If the agreement is shown by the direct words of the parties, spoken or written, the contract is said to be an express one." Boland v. Catalano, 202 Conn. 333, 336-37, CT Page 11183521 A.2d 142 (1987). "If [an] agreement can only be shown by the acts and conduct of the parties, interpreted in the light of the subject matter and of the surrounding circumstances, then the contract is an implied one." Id., 337.
"A contract is to be construed as a whole and all relevant provisions will be considered together." HLO Land OwnershipAssociates Ltd. v. Hartford, 248 Conn. 350, 356, ___ A.2d ___ (1999). "[A] contract must be construed to effectuate the intent of the contracting parties. The intention of the parties to a contract is to be determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction." Id, 356-57. "All relevant evidence is admissible on the issue of contract interpretation, and any determination of the meaning or ambiguity should only be made in the light of the relevant evidence of the situation and relations of the parties, the subject matter of the transaction, preliminary negotiations and statements made therein, usages of trade, and the course of dealing between the parties."Foley v. Huntington Company, 42 Conn. App. 712, 733-734,682 A.2d 1026, cert. denied, 239 Conn. 931, 683 A.2d 397 (1996).
The facts establish the defendants were under no express obligation to provide notice to the plaintiffs of the need to obtain the two permits in question. However, the facts demonstrate that the defendants had an implied contractual obligation to provide such notice. In 1985, Joseph Kasper advised John Lombard that his firm could provide comprehensive services for the Ledgebrook project. These services included providing notice to potential clients of jurisdictional constraints and requirements of all governmental agencies and assisting in determining the need for obtaining all permits and approvals.
In 1986, Kasper employed in excess of one hundred site planning professionals. Throughout the period of 1986-1990, these professionals had experience with federal, state, and municipal land regulation agencies. Both Kasper and DCA held themselves out as licensed and competent site planning professionals. Kasper was experienced in the development of commercial retail centers, while the Lombards had no prior experience with either land use regulations or site development.
Kasper performed professional services for WLD prior to the parties' first written agreement. The services included making inquiries about the property and producing a site contour map. CT Page 11184 (Pls.' Ex. 107.) On January 17, 1986, the parties entered into their first written agreement. (Pls.' Ex. 11.) In consideration of the sum of $32,200, Kasper agreed to perform a variety of professional services as set forth in "Task 1" and "Task 2" of the agreement. Included within the provisions is the requirement that wetlands be located and marked on the site. Thereafter, the identified areas of wetlands were to be surveyed and depicted on a topographical map.
In addition, Kasper contracted to conduct a feasibility study which included the preparation of a site analysis map and schematics for both residential and commercial development. In the field of site planning professionals, it is understood that the primary purpose of a feasibility study is to ascertain the suitability of a particular piece of property for intended use. The study includes the identification of the property's physical constraints and the determination of the necessary governmental approvals and permits. A site analysis map is prepared during the course of the study and depicts constraints on the property. These constraints include zoning, topography, and wetlands.
The intended role of the defendants, as demonstrated by the evidence, was to design a project which met the needs of the plaintiffs and the constraints of the site. It was evident from the outset of the project that the property contained a substantial amount of wetlands. Site design professionals are concerned about the environment and the need to preserve wetlands. Information pertaining to ACOE jurisdiction was readily available to the public from a variety of sources and should have been known by experienced site design professionals.
In accordance with the terms of the January, 1986, agreement, Kasper retained soil scientist Joyce Raabe to field mark state delineated wetlands, and Raabe identified the presence of approximately ten acres of wetlands. Swift met with Raabe on May 21, 1986, at which time Raabe informed Swift an ACOE permit would be required for the project. Swift responded no permit was necessary.
Kasper's work progressed pursuant to the January, 1986, agreement for several months. When approximately 25 percent of the contract price had been expended on the feasibility study, WLD determined the project would consist solely of commercial development. Although the feasibility study had identified the appropriate use of the property, the study was also intended to CT Page 11185 identify physical constraints of the property and necessary permits and approvals. At no time did WLD instruct Kasper to conclude its research and analysis of the site.
In May of 1986, the parties met to discuss two alternative proposals for retail commercial development. Those proposals were set forth in a memorandum from Swift to John Lombard. (Pls.' Ex. 12.) At that meeting, the participants discussed the need to obtain various land use permits. WLD concluded it would proceed with the design and development of the 200,000 square foot proposal. Kasper was aware the larger proposal would result in the filling and disturbance of a larger wetland area.
In accordance with Swift's proposal, Kasper was paid on an hourly basis for its professional services. Those services included the preparation and presentation of applications to the WPZC and WIWC, both of whom granted approvals. Kasper also applied for and obtained an STC permit. During this time, Swift informed WLD Kasper had obtained all permits.
Swift reviewed the Town of Winchester's regulations in connection with his preparation of the inland wetlands application. These regulations contained a provision which placed individuals on notice that other governmental agencies may have jurisdiction over a site. Swift had prior experience in reviewing municipal regulations. This notice was a common provision within municipal regulations during that period of time.
In 1986, Kasper was also providing professional design services to the Lombards in connection with the development of retail stores in the city of Waterbury. During that project, application was made to the DEP for permission to relocate a watercourse and disturb wetlands; that application was approved. Swift was aware of the Waterbury project at the time of his involvement in the Ledgebrook project.
The parties thereafter entered into two written contracts wherein the defendants agreed to provide construction design services for the Ledgebrook project. (Pls' Ex. 14, 15.) In the latter of the two agreements, DCA was contractually obligated to assist the WLD in its "responsibility for filing documents required for the approval of governmental authorities having jurisdiction over the project." (Pls.' Ex. 15, Art 2 § 2.4.4.)
Swift knew the ACOE might have jurisdiction over the wetlands CT Page 11186 on this site. However, neither he nor any other Kasper representative made any attempt to convey effectively this relevant information to the Lombards. The Lombards were not even advised Kasper could further pursue the need for the additional permits for extra compensation. Swift expressed his justification for not advising the Lombards by stating, "it was not our task." (Tr., Sept. 9, 1998, afternoon session, p. 31).
Yet, notwithstanding this, Kasper did in fact notify WLD of the need for municipal inland wetland and planning and zoning approvals, as well as the need for an STC permit. Further, by Swift's own admission, he indicated "[a]ny permits that [Kasper] knew of that were needed for the shopping center, we would have pointed them out to the client." (Tr., Aug. 4, 1998, p. 84.) Swift also acknowledged Kasper could have investigated and obtained the permits by utilizing either its own staff or outside professionals. Despite there being no specific written contractual requirement to the obtain the municipal and STC permits, Kasper nevertheless addressed these permits and approvals and WLD paid for the professional services.
In addition, the defendants assisted in the initial attempt to secure the ACOE and DEP permits on an after-the-fact basis. This was consistent with the parties' prior course of dealing though, here again, there was no express written obligation that Kasper perform these professional services.
The court finds the defendants had an implied contractual duty to notify the plaintiffs of the need to investigate the applicability of the ACOE and DEP permits to the project. The intent of the parties has been demonstrated by their written and oral agreements as well as their course of dealing throughout the Ledgebrook project. Further, the defendants' expertise in commercial site development makes clear they were in a superior position to know of the need to investigate the applicability of the ACOE and DEP requirements and to act on that knowledge.
The intended purpose of the contracts was to design a 200,000 square foot commercial retail facility which met all permit requirements. The plaintiffs paid the defendants approximately $541,000 for the professional design services. To date, the plaintiffs have expended approximately $15 million on the project which remains incomplete as a result of the defendants' breach of contract. Surely, no business entity would spend $541,000 for site planning services for a project that could not be completed CT Page 11187 because of missing permits, the need for which Kasper and DCA were contractually obligated to address.
 Count Three — Breach of Express Warranty of Workmanship
The plaintiffs rely heavily on the case of Johnson v. Healy,176 Conn. 97, 405 A.2d 54 (1978), in support of their claim that Kasper breached an express warranty of workmanship by not providing the ACOE and DEP permits. In that case, the defendant Healy warranted to the plaintiff Johnson that he built a particular home with quality materials and that there was nothing wrong with the home. "[E]xpress warranty encompasses material representations which are false, without regard to the state of mind or the due care of the person making the representation."Johnson v. Healy, supra, 176 Conn. 100. Kasper maintains that breach of warranty is more appropriate to product liability claims and that it does not apply to design professionals. (Defs.' First Sp. Def.)
The court finds that the defendants' representations do not rise to the level of an express warranty to obtain or to notify the plaintiffs of the need to obtain ACOE and DEP permits. The court has determined that the defendants had an obligation to notify the plaintiffs of the need to obtain ACOE and DEP permits pursuant to an implied contractual obligation. This obligation flowed from written and oral representations as well as from the course of conduct between the parties. The court finds the defendants did not breach an express warranty of workmanship and the plaintiffs cannot prevail on this claim.
 Count Four — Negligence
In the fourth count, the plaintiffs allege the defendants breached a duty to exercise the degree of reasonable care required of architects, engineers and other site planning professionals. The defendants allege that the plaintiffs failed to identify the specific standard or custom of professional practice which has not been complied with. (Defs.' Second Sp. Def.)
The plaintiffs contend Kasper and DCA, as site planning professionals, provided engineering, architectural and survey services to the plaintiffs pursuant to their contracts. The plaintiffs alleged the defendants negligently performed these contracts by failing to advise them of the need to obtain ACOE CT Page 11188 and DEP permits and/or by not obtaining the permits.
"The essential elements of a cause of action in negligence are well established: duty; breach of that duty; causation; and actual injury." Rk Constructors, Inc. v. Fusco Corp. ,231 Conn. 381, 384, 650 A.2d 153 (1994). "Duty is a legal conclusion about relationships between individuals, made after the fact, and imperative to a negligence cause of action. The nature of the duty, and the specific persons to whom it is owed, are determined by the circumstances surrounding the conduct of the individual." (Internal quotation marks omitted.) Lodge v. Arett Sales Corp. ,246 Conn. 563, 571, 717 A.2d 215 (1998). In determining the existence of a duty, "the threshold inquiry has always been whether the specific harm alleged by the plaintiff was foreseeable to the defendant." Id., 572 n. 7. A party "may be liable in negligence for the breach of a duty which arises out of a contractual relationship. " Neiditz v. Morton S. FineAssociates, Inc., 199 Conn. 683, 688, 508 A.2d 438 (1986).
"Malpractice is commonly defined as the failure of one rendering professional services to exercise that degree of skill and learning commonly applied under all the circumstances in the community by the average prudent reputable member of the profession with the result of injury, loss, or damage to the recipient of those services' (Internal quotation marks omitted.)Davis v. Margolis, 215 Conn. 408, 415, 576 A.2d 489 (1990). "In a [malpractice] case against an engineer, it is incumbent upon the plaintiff to produce evidence as to what a skilled engineer of ordinary prudence engaged in the same line of business would have exercised in the same or similar circumstances. (Internal quotation marks omitted.) Matyas v. Minck, 37 Conn. App. 321,327, 655 A.2d 1155 (1995). The court finds that this principle of law is equally applicable to architects and other site planning professionals.
Expert testimony established the duty of care owed to a client to identify inland wetland permit requirements was the same for all site planning professionals. A feasibility study undertaken by a site planner requires the evaluation of governmental land use regulations and permits including ACOE and DEP permits. The prevailing standard of care among site planning professionals mandates they advise clients of constraints and permitting requirements. It is a deviation from the standard of care for site planning professionals not to be aware of ACOE and DEP jurisdiction over inland wetlands. CT Page 11189
The prevailing standard of care for site planning professionals requires they notify clients of government jurisdiction over wetlands and the potential ramifications for failure to comply with permitting requirements. The standard of care additionally requires a site planning professional to convey to a client information learned from a soil scientist regarding the need for a wetland permit. A site planning professional has a continuing duty to be aware of land use regulations and to advise the client of them throughout the duration of the project.
The defendants breached the standard of care by failing to:
a) address the potential need for ACOE and DEP permits during the feasibility study;
b) be aware of the potential ACOE and DEP jurisdiction over the site;
c) notify the plaintiffs of the likely ramifications of not complying with governmental inland wetlands permitting requirements; and
d) notify the plaintiffs of information learned from soil scientist Joyce A. Raabe and other sources regarding ACOE jurisdiction over the site.
Having determined that the defendants breached certain duties, the court must evaluate whether the defendants' conduct proximately caused the plaintiffs' alleged injuries. The test for proximate cause is "would the ordinary person in the defendant's position, knowing what he knew or should have known, anticipate that harm of the general nature of that suffered was likely to result?" Lodge v. Arett Sales Corp. , supra, 246 Conn. 572 n. 7.
The defendants were well aware the plaintiffs intended to use the property for a retail commercial purpose. They knew the plaintiffs expended substantial sums of money for design and site work. They knew the Phase II portion of the project was designated for use by a large department store. They knew or should have known that the failure to consider all necessary permits would thwart the project's completion. Additionally, they knew or should have known the plaintiffs could not sell or lease at full value an incomplete project that was not in compliance with federal and state inland wetlands regulatory requirements. CT Page 11190 Finally, the defendants knew or should have known that the inability to sell or lease the Phase II portion of the project would result in economic loss to the plaintiffs and in fact they have sustained economic damages as a proximate result of the defendants' conduct.
Accordingly, the defendants are liable to the plaintiffs in negligence.
 Count Five — Breach of Fiduciary Duty
The law on the obligations of a fiduciary is well settled. "A fiduciary or confidential relationship is characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interests of the other. The superior position of the fiduciary or dominant party affords him great opportunity for abuse of the confidence reposed in him." Murphyv. Wakelee, 247 Conn. 396, 400, 721 A.2d 1181 (1998). "[A] breach of fiduciary duty implicates a duty of loyalty and honesty."Beverly Hills Concepts, Inc., v. Schatz Schatz, Ribicoff Kotkin, 247 Conn. 48, 57, 717 A.2d 724 (1998).
Kasper maintains that a fiduciary duty does not exist in the context of a design professional and client. (Defs.' Fourth Sp. Def.) The fact that the defendants had superior knowledge in site planning and development does not, by itself, give rise to a fiduciary relationship. The defendant's obligations to these plaintiffs grew out of a business relationship which did not impose on the defendants the level of loyalty or invoke in them the kind of trust which characterizes a fiduciary relationship.
The Connecticut appellate courts have found breaches of fiduciary duties where fraud, self-dealing or conflicts of interest were present although the absence of these elements does not preclude a finding of such breach. See Murphy v. Wakelee, supra, 247 Conn. 400. The plaintiffs have not carried their burden of establishing that there existed a fiduciary relationship between the parties and the court finds none existed.
 Count Six — Negligent Misrepresentation
"One who, in the course of his or her business, profession or employment supplies false information for the guidance of others CT Page 11191 in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he or she fails to exercise reasonable care or competence in obtaining or communicating the information."Beverly Hills Concepts, Inc., v. Schatz Schatz, Ribicoff Kotkin, supra, 247 Conn. 57. "Even an innocent misrepresentation of fact may be actionable if the declarant has the means of knowing, ought to know, or has the duty of knowing the truth."Williams Ford, Inc. v. Hartford Courant Co., 232 Conn. 559, 575,657 A.2d 212 (1995)
The defendants argue that the plaintiffs did not establish that Kasper provided false information (Defs.' Third Sp. Def.) In the planning stages of the project in 1986, Swift informed WLD that all permits had been obtained. Based upon this representation, WLD entered into additional contracts with Kasper and DCA, and WLD expended funds for the subsequent phases of the development of the project. In addition, the defendants informed the plaintiffs that an ACOE permit for Ledgebrook was not necessary. Clearly, this information was inaccurate.
The defendants did not exercise reasonable care in determining whether the ACOE and DEP permits were necessary. The plaintiffs relied upon these negligent misrepresentations to their detriment. The court finds that the defendants are liable under count six of the amended complaint.
 Count Seven — Fraudulent Concealment
Although the plaintiffs designated their seventh cause of action "fraudulent concealment," the plaintiffs are, in fact, alleging a claim for fraudulent nondisclosure.
"[T]he essential elements of an action in common law fraud are that: (1) a false representation was made as a statement of fact; (2) it was untrue and known to be untrue by the party making it; (3) it was made to induce the other party to act upon it; and (4) the other party did so act upon the false representation to his injury." Parker v. Shaker Real Estate,Inc., 47 Conn. App. 489, 493, 705 A.2d 210 (1998). "For a nondisclosure to amount to fraud, there must be a failure to disclose known facts and, in addition thereto, a request or an occasion or a circumstance which imposes a duty to speak. (Internal quotation marks omitted.) Kenney v. HealeyFord-Lincoln-Mercury, Inc., 53 Conn. App. 327, 333, ___ A.2d ___ CT Page 11192 (1999).
The claim is that Raabe provided information to Swift that an ACOE permit would be required and that Swift's failure to so inform the plaintiffs constituted fraudulent concealment. The court finds that, absent a showing Swift knew and believed such permit was necessary, his conduct did not rise to the level of fraudulent conduct because an intent to deceive has not been established. Such conduct is more appropriately a failure to pursue the information and, therefore, sounds in negligence. Accordingly, the defendants are not liable to the plaintiffs for the tort of fraudulent nondisclosure.
 Count Eight — CUTPA
The plaintiffs allege in count eight of its amended complaint that Kasper and DCA committed CUTPA violations. The defendants allege CUTPA does not apply to design professionals. (Defs.' Fifth Sp. Def.) "General Statutes § 42-110g(a) affords a cause of action to any person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section42-110b." Beverly Hills Concepts, Inc., v. Schatz Schatz,Ribicoff Kotkin, supra, 247 Conn. 78-79.
General Statutes § 42-110g(f) provides, "an action under this section may not be brought more than three years after the occurrence of a violation of this chapter." "Where . . . a specific time limitation is contained within a statute that creates a right of action that did not exist at common law, then the remedy exists only during the prescribed period and not thereafter." Avon Meadow Condominium Association, Inc., v. Bankof Boston Connecticut, 50 Conn. App. 688, 699-700, 719 A.2d 66, cert. denied, 247 Conn. 946, ___ A.2d ___ (1998). When a statute creates a cause of action and prescribes its procedural limitations, the statute must be strictly complied with. See, e.g., Pittsburgh Plate Glass v. Dahm, 159 Conn. 563, 565,271 A.2d 55 (1970). "The courts of Connecticut have repeatedly held that, under such circumstances, the time limitation is a substantive and jurisdictional prerequisite, which may be raised at any time, even by the court sua sponte, and may not be waived." Avon Meadow Condominium Association, Inc., v. Bank ofBoston Connecticut, supra, 700.
Although Kasper did not specify which statute of limitations CT Page 11193 applied in its special defenses, the court must address §42-110g(f) because the statute implicates the court's jurisdiction. The parties briefed § 52-584a, however § 42-110g(f) is the operative statute of limitations for CUTPA.
In this regard, "[t]he legislature is presumed to be aware and to have knowledge of all existing statutes and the effect which its own action or nonaction may have on them." WindhamFirst Taxing District v. Windham, 208 Conn. 543, 554,546 A.2d 226 (1988). The legislature must have enacted both statutes with the intention that both statutes could exist in harmony. See, e.g., Lees v. Middlesex Insurance Co., 219 Conn. 644, 653-54,594 A.2d 952 (1991) (holding that § 38-98 did not confer a one-year statute of limitations on a CUTPA claim because § 42-110g(f) provides for three years)
In their complaint, the plaintiffs do not specifically allege when Kasper and DCA committed CUTPA violations. However, in their March 15, 1999, post-trial brief, the plaintiffs articulate the basis of the claim. They state Kasper and DCA violated CUTPA by offering to provide architectural and engineering services without having the required licenses and misrepresenting their licensing and professional abilities to induce WLD into entering into a contractual relationship thereby causing substantial injury.
Given the plaintiffs' allegations, any claim of deceptive or unfair trade practices would have occurred no later than 1988. The plaintiffs filed their complaint against Kasper and DCA in 1996, well beyond CUTPA's three-year statute of limitations. General Statutes § 42-110g(f) is an "occurrence" statute. SeeFichera v. Mine Hill Corp. , 207 Conn. 204, 212-13, 541 A.2d 472
(1988). The last occurrence of a CUTPA violation would have been in 1988, some eight years before WLD filed its complaint. Accordingly, § 42-110g(f) bars the plaintiffs' CUTPA claim.
 DEFENDANTS' ADDITIONAL SPECIAL DEFENSES
As set forth below, the court will examine the defendants' special defenses that were not addressed above.
 Sixth and Seventh Special Defenses
The defendants allege that the plaintiffs' claims are barred by the statute of limitations. As discussed earlier, the CT Page 11194 defendants did not specify which statute of limitations applies. With regards to the CUTPA claim, § 42-110g(f) applies. For all other claims, § 52-584a is the applicable statute of limitations.[7] General Statutes § 52-584a(c) provides, "[f]or purposes of subsections (a) and (b) of this section, an improvement to real property shall be considered substantially complete when (1) it is first used by the owner or tenant thereof or (2) it is first available for use after having been completed in accordance with the contract or agreement covering the improvement, including any agreed changes to the contract or agreement, whichever occurs first." "In the ordinary case, therefore, [the seven year statute of limitations in § 52-584a] begins to run from the date of the substantial completion of the improvement for which the architect or engineer performed the services." Grigerik v. Sharpe, 247 Conn. 293, 307-08,721 A.2d 526 (1998).
Kasper prepared the site work specifications, dated June 10, 1988, for the Shops at Ledgebrook. The site for the approximate 200,000 square foot structure was to be completed in two phases. The site work began in late 1988 and continued while the Phase I buildings were being constructed.
The site work on the Phase II portion of the site was still not complete at the time of trial. The uncompleted work included finish grading, utility installation, paving, and landscaping. This work had not been completed as a result of the lack of permits and the stop work orders of the ACOE and DEP.
Therefore, the breach of contract, malpractice and negligent misrepresentation causes of action are not barred by § 52-584a
because the Phase II portion of Ledgebrook is not substantially complete.
 Ninth Special Defense
The defendants allege the proposed Wal-Mart development could not have been constructed pursuant to local approval, but would require extensive additional filling and ACOE and DEP approvals in addition to supplemental local approvals.
The 1994 WLD and Wal-Mart purchase and sale agreement for the Phase II portion of Ledgebrook included a condition that WLD was to provide Wal-Mart with the necessary approvals to allow Wal-Mart to build a department store of approximately 93,000 CT Page 11195 square feet. (Pls.' Ex. 17.) WLD received approvals to construct a 200,000 square foot shopping plaza. As built, the structure without the Phase II portion is 101,000 square feet in size with the addition of a 4,000 square foot pad site utilized as a bank. The court finds the defendants have not proven that the town's authorizations would not accommodate Wal-Mart's proposals.
 Tenth through Fourteenth Special Defenses
The tenth through the fourteenth special defenses are as follows:
Tenth Special Defense — The plaintiffs relied on their counsel, not upon the defendants for advice as to required governmental approvals;
Eleventh Special Defense — DCA had no involvment with any permitting activities or efforts;
Twelfth Special Defense — The plaintiffs exceeded the area of authorized wetland filling by more than one acre;
Thirteenth Special Defense — A section of the June 7, 1988, contract between WLD and DCA provides that architect may be required to provide additional services, but such services were never requested of the defendants; and
Fourteenth Special Defense — The determination as to required approvals is a legal matter to be determined by legal consultants, and not by design professionals. (Defs.' Answer and Sp. Defs., pp. 7-8.)
These five special defenses have been addressed in the facts found and the court finds the defenses unpersuasive
 DAMAGES
Having determined the defendants are liable for breach of contract, negligence and negligent misrepresentation the court must calculate and award fair, just and reasonable damages.
"To authorize a recovery of more than nominal damages, facts must exist and be shown by the evidence which affords a reasonable basis for measuring the plaintiffs' loss. The plaintiff has the burden of proving the nature and extent of CT Page 11196 loss. Mathematical exactitude in the proof of damages is often impossible, but the plaintiff must nevertheless provide sufficient evidence for the trier of fact to make a fair and reasonable estimate." Willow Springs Condominium Assn., Inc. v.Seventh BRT Development Corp. , 245 Conn. 1, 59, 717 A.2d 77
(1998).
The evidence demonstrated that the plaintiffs have thus far expended approximately $1.5 million for site work performed on the Phase II portion of the site. These monies were spent with the expectation the site would accommodate a large department store, the presence of which would increase the size of the Shops at Ledgebrook to an approximate 200,000 square foot commercial retail shopping center. As the project designers, the defendants knew the intended use of the Phase 2 portion of the property.
The plaintiffs have spent approximately $15 million on the construction of the shops at Ledgebrook. In lieu of the planned 200,000 square foot building, the existing structure is 101,000 square feet with an additional 4,000 square foot pad site. The fair market value of Phase 2 property without final permit approval is $500,000.
The defendants posit that the plaintiffs' damages, if any, are limited to the resultant diminution in the value of the property which they claim is determined by the cost of repair. (Defs.' Post-Trial Brief, Apr. 27, 1999, pp. 20-23.) The defendants cite numerous cases in support for their position including Willow Springs Condominium Assn., Inc. v. Seventh BRTDevelopment Corp. , supra, 245 Conn. 1 (1998). These cases establish that the proper measure of damages for injury to land is the cost of repair.
The defendants maintain that the recoverable costs associated with restoring the property are as follows: engineering costs — $11,416; legal fees — $5300; remedial site work — $20,000; total damages — $36,716.
Contrary to the defendants' assertions, however, this case at its core is not exclusively an injury to land case. Rather, this case is about the failure to address governmental inland wetlands approvals properly, the expenditures of monies to develop a site and a lost business expectation. Therefore, the determination of what is fair, just and reasonable is not limited to damages for injury to land.[8]
CT Page 11197
The plaintiffs' damage expert, Thomas Ferreira, suggested two alternative models for the calculation of damages. In the first model, damages are based upon: lost rental income; additional interest paid on the mortgage note; out of pocket expenses incurred in attempting to secure the permits; and additional property taxes paid on the Phase II portion of the property. In the second model, Ferreira states a profit of $2 million would have resulted had the property originally been sold to Wal-Mart. Adjusted for the time value of money, the profit would equal $2.8 million. From this figure, he deducted $1.4 million which he concludes is the plaintiffs' profit if they sell to Wal-Mart under the terms of its most recent offer.
Ferreira's two models are based on numerous speculative assumptions and inaccurate projections. For example, Ferreira assumed, without a factual basis, that a decrease in rental income derived from other Ledgebrook tenants was caused by the absence of the Wal-Mart store on the site. In addition, he projected the lost profit on the sale to Wal-Mart was $2 million, and, in so doing, he did not consider the development costs of Phase II.
"A damage theory may be based on assumptions so long as the assumptions are reasonable in light of the record evidence".Beverly Hills Concepts, Inc. v. Schatz Schatz, Ribicoff Kotkin, supra, 247 Conn. 70. An award of damages cannot be based upon guess, conjecture or surmise. Considering Ferreira's testimony and analysis as a whole, the court finds his calculations too speculative to be given weight and are not adopted by the court as the appropriate measures of damages.
As a general proposition, "in awarding damages upon a breach of contract, the prevailing party is entitled to compensation which will place him in the same position he would have been had the contract been properly performed". Levesque v. D MBuilders, Inc., 170 Conn. 177, 181, 365 A.2d 1216 (1976). "The plaintiff is entitled to recover all, damages proximately caused by the defendant's negligent performance of the contract whether or not the results were reasonably to be anticipated." Mattegatv. Klopfenstein, 50 Conn. App. 97, 104, 717 A.2d 276, cert. denied, 247 Conn. 922, 722 A.2d 810 (1998).
In this regard, "[t]he proximate cause test for negligence applies when assessing damages for negligent performance of a CT Page 11198 contract. The requirement of proximate cause is a less severe limitation of liability than the requirement of anticipation or foreseeability in breach of contract cases. A proximate cause is [an] actual cause that is a substantial factor in the resulting harm." Mattegat v. Klopfenstein, supra, 50 Conn. App. 105; see also Neiditz v. Morton S. Fine Association, Inc, supra,199 Conn. 689.
Since the plaintiffs have proven the defendants' liability under both contract and tort theories, the proper measure of damages are those which were proximately caused by the defendants' negligent conduct.
The plaintiffs claim damages for lost profits. "Damages for losses of profits are recoverable only to the extent that the evidence affords a sufficient basis for estimating their amount in money with reasonable certainty." Humphrys v. Beach,149 Conn. 14, 21, 175 A.2d 363 (1961). "[M]ere uncertainty as to the amount of lost profits may be dispelled by the same degree of proof as is required in other civil actions, that is, the amount may be determined approximately upon reasonable inferences and estimates." Burr v. Lichtenheim, 190 Conn. 351, 360,460 A.2d 1290 (1983). The burden is upon the plaintiff to "present sufficiently accurate and complete evidence for the trier of fact to be able to estimate these profits with reasonable certainty."Beverly Hills Concepts, Inc. v. Schatz Schatz, Ribicoff Kotkin, supra, 248 Conn. 70.
The plaintiffs have proven entitlement to damages for both lost profits and out of pocket expenses in the total amount of $1,516,716. The court has calculated this figure in the following manner:
a) Lost profits
In 1994 Wal-Mart agreed to purchase the property for $3 million. The sale would have been consummated but for the lack of the ACOE and DEP permits. The plaintiffs' costs which must be subtracted from the sales price include $1.5 million expended for site work, $800,000 to be paid to Rite-Aid pharmacy, and $200,000 as a sales commission. This results in total costs of $2.5 million, leaving $500,000 in lost profit.
b) Out of Pocket Expenses
CT Page 11199
The plaintiffs have expended $1.5 million to develop the site. In addition, they have spent $5300 for legal fees and $11,416 for engineering costs in an effort to obtain the after-the-fact permits. The total expenses are $1,516,716. The current fair market value of the property is $500,000, which results in a loss of $1,016,716.
The plaintiffs have sustained their burden of proving damages in the total amount of $1,516,716 ($500,000 in lost profits plus $1,016,716 in out-of-pocket expenses).
 CONCLUSION
The court finds that the defendants are liable to the plaintiffs for breach of contract, negligence and negligent misrepresentation. The court awards the plaintiffs $1,516,716 in damages plus costs.
BY THE COURT
PETER EMMETT WIESE, JUDGE