RUTH BOLAND *v.* RONALD M. CATALANO
(12869)

PETERS, C. J., HEALEY, SHEA, CALLAHAN and F. HENNESSY, Js.

Argued December 10, 1986—decision released February 17, 1987

*M. Katherine Webster-O'Keefe,* for the appellant (plaintiff).

*Richard L. Nahley,* with whom were *Robert C. Stearns, Jr.,* and, on the brief, *Ronald M. Sullivan,* for the appellee (defendant).

SHEA, J. The plaintiff, Ruth Boland, brought suit against the defendant, Ronald M. Catalano, for the return of certain personal property and to recover an equal share of the money and property they had accumulated while living together in an unmarried relationship from 1971 to 1980. The trial court, *Pickett, J.,* rendered judgment in accordance with the conclusion of the attorney trial referee that, while the plaintiff was entitled to the return of the specific items of personal property she sought, her major claims for relief based on contract and quantum meruit were not supported by the evidence. Because we agree with the plaintiff's contention on appeal that the referee's conclusion that the parties had not contracted to share property was wholly inconsistent with facts found in his report, we set the judgment aside and remand for a new trial.

The following facts appear to be undisputed. The parties began living together as unmarried lovers in 1971 in a house the defendant owned in the town of Sherman. In 1972 they became interested in building a new home on approximately twenty-seven wooded acres of land in the town of New Milford. Title to this realty was taken in the name of the defendant, who explained to the plaintiff "that it was easier to place it in his name because he had equity in another house and because they were not married." While the defend-

ant was solely liable for the mortgage loan on the New Milford property in the amount of $29,500, as well as on a loan from his mother of $13,320 obtained for the purchase of the property, the plaintiff helped to plan, build and improve the house into which the parties moved, and also cleared and landscaped portions of the grounds. The plaintiff does not claim to have contributed any funds toward the purchase of the real estate or construction of the house.[1]

During their years together, the parties were regarded by some members of the public as husband and wife. During the period of their cohabitation, the plaintiff earned approximately $50,000, which she turned over to the defendant. The defendant, in turn, provided the plaintiff with an allowance, which she used for groceries, and for personal and household expenses. Although the parties maintained separate bank and charge accounts and filed separate income tax returns, the defendant used the plaintiff's bank account, and each had signatory power to use the other's charge accounts. By agreement the plaintiff was responsible for the housework, grocery shopping, cooking and landscaping, while the defendant ran his automotive business.

In 1980, when the parties' relationship ended, the plaintiff brought this action in four counts claiming: (1) a contractual right to a one half share of all the personalty accumulated during their relationship; (2) an equitable interest in the New Milford realty; (3) a right to restitution based on quantum meruit;[2] and (4) com-

---

[1] One subordinate fact found by the trial referee suggests that the plaintiff's earnings were, in fact, used for the mortgage payments: "When the Plaintiff made a statement as to the amount of money she made, the Defendant said, 'Don't knock it—it pays the mortgage.' "

[2] Because the complaint of the plaintiff involved claims of both contract implied-in-fact and contract implied-in-law, we note that "[a]lternative counts seeking inconsistent remedies are generally permitted in the same

plete ownership of her own property. The trial court, *Buzaid, J.,* rendered a judgment of dismissal of the second, third and fourth counts of the complaint for failure to make out a prima facie case. In *Boland* v. *Catalano,* 1 Conn. App. 90, 468 A.2d 1238 (1983), the Appellate Court set the judgment aside because the proof had been sufficient to establish a prima facie case, and remanded the action for a new trial. The case was subsequently referred to an attorney trial referee, who concluded in his memorandum that the plaintiff was entitled to recover only some furniture that she had purchased or received as gifts. In this appeal the plaintiff, who had filed an objection to acceptance of the referee's report pursuant to Practice Book § 440; see *Seal Audio, Inc.* v. *Bozak, Inc.,* 199 Conn. 496, 518, 508 A.2d 415 (1986); contends essentially that the trial court, *Pickett, J.,* erred in rendering judgment in accordance with the referee's report because (1) the conclusions reached by the referee are contrary to the facts found, and (2) the policy considerations underlying such conclusions are specious.

In his supplemental report the attorney trial referee found the following "ultimate fact": "The parties agreed implicitly by their conduct and/or words to share their earnings and the fruits of their joint labor." "A contract is an agreement between parties whereby one of them acquires a right to an act by the other; and the other assumes an obligation to perform that act. The obligation so assumed is called a promise. Contracts may be express or implied. These terms, however, do not denote different kinds of contracts, but have reference to the evidence by which the agreement between the parties is shown. If the agreement is shown

complaint . . . . " 3 Restatement (Second), Contracts § 378, comment a; see *Fuessenich* v. *DiNardo,* 195 Conn. 144, 148–52, 487 A.2d 514 (1985); cf. *Litton Industries Credit Corporation* v. *Catanuto,* 175 Conn. 69, 72–73, 394 A.2d 191 (1978).

by the direct words of the parties, spoken or written, the contract is said to be an express one. But if such agreement can only be shown by the acts and conduct of the parties, interpreted in the light of the subject matter and of the surrounding circumstances, then the contract is an implied one." *Skelly* v. *Bristol Savings Bank,* 63 Conn. 83, 87, 26 A. 474 (1893); *Hale* v. *Fred Benvenuti, Inc.,* 38 Conn. Sup. 634, 638–39, 458 A.2d 694 (1983). A reasonable conclusion logically following from the referee's finding is that the parties created a contract to share their earnings and property accumulated during the relationship. Whether this contract is styled "express" or "implied" involves "no difference in legal effect, but lies merely in the mode of manifesting assent." 1 Restatement (Second), Contracts § 4, comment a; see also E. Farnsworth, Contracts (1982) pp. 124, 142 n.2.

Despite the finding of an implied contract to share their earnings and the fruits of their joint labor as an "ultimate fact," the referee effectively awarded all of the property acquired during the cohabitation to the defendant, except for a few items of furniture as mentioned. In his memorandum[3] the referee concluded that "[t]he parties did not express the mutual assent necessary to form an express contract. . . . Similarly, the evidence as to the circumstances and conduct of the parties falls short of a standard required by Connecticut for an implied contract between the parties regarding the disposition of property." " 'As this court has many times stated, conclusions that violate "law, logic or reason or are inconsistent with the subordinate facts" cannot stand.' *Delfino* v. *Vealencis,* 181 Conn.

---

[3] After the referee had issued his memorandum, the plaintiff made a request for findings, which annexed a draft statement of facts, pursuant to Practice Book § 435. In response to that request, the referee issued his supplemental report, which adopted the plaintiff's draft finding of the implied contract.

533, 543, 436 A.2d 27 (1980)." *Edens* v. *Kole Construction Co.,* 188 Conn. 489, 502–503, 450 A.2d 1161 (1982). The contradiction between the finding and conclusions of the referee, therefore, precludes us from sustaining the judgment accepting the referee's report.

We are not persuaded by the defendant's attempt to reconcile the referee's conclusions with his finding of an agreement between the parties. The defendant interprets this finding to mean that the parties agreed to share jointly acquired property only as long as the relationship lasted. According to the defendant, "[t]he evidence presented at trial did not convince the referee that the parties agreed to or contemplated any exchange of ownership rights." Belying this assertion, however, is the unqualified agreement to share found as an "ultimate fact" and also the subordinate fact found by the referee that "[t]he defendant referred to the New Milford house as being 'our house' to the plaintiff." The referee found additional facts relating to the substantial amount of time and labor the plaintiff had devoted to building and maintaining the home. We therefore decline to read into the finding of an agreement between the parties "to share their earnings and the fruits of their joint labor" a concomitant finding that the parties intended no obligations arising from such agreement to survive the period during which they lived together.

A possible explanation of the discrepancy between the finding of an implied agreement to share and the recommended disposition of the case is that the referee viewed certain policy considerations as preventing the agreement between the parties from rising to the level of a contract. The term "agreement" has in some respects a wider meaning than "contract." 1 Restatement (Second), Contracts § 3, comment a. "A contract is a promise or a set of promises for the breach of which the law gives a remedy, or the performance

of which the law in some way recognizes as a duty."
Id., § 1. An agreement embodying promises that the
law will not enforce is thus, by definition, not a contract.

In his memorandum, the referee stated that "Con-
necticut has refused to accord legal consequences to
informed unmarried cohabitants. . . . Moreover, in
the light of Connecticut's public policy with respect to
common law marriages, rights accruing to unmarried
individuals who choose to cohabit cannot be adjudicated
simply on the basis of the law of express contract." The
referee based these assertions on this court's decision
in *McAnerney* v. *McAnerney,* 165 Conn. 277, 334 A.2d
437 (1973), and the Illinois case of *Hewitt* v. *Hewitt,*
77 Ill. 2d 49, 394 N.E.2d 1204 (1979). It is conceivable
that the referee may have viewed the refusal in this
state to recognize common law marriages or to impose
legal consequences simply by virtue of cohabitation
between unmarried persons as militating against con-
tractual enforcement of the implied agreement to share.

We agree with the trial referee that cohabitation
alone does not create any contractual relationship or,
unlike marriage, impose other legal duties upon the par-
ties. In this jurisdiction, common law marriages are not
accorded validity. *Hames* v. *Hames,* 163 Conn. 588,
593, 316 A.2d 379 (1972); *State ex rel. Felson* v. *Allen,*
129 Conn. 427, 432, 29 A.2d 306 (1942). The rights
and obligations that attend a valid marriage simply do
not arise where the parties choose to cohabit outside
the marital relationship. *McAnerney* v. *McAnerney,*
supra, 285. Ordinary contract principles are not sus-
pended, however, for unmarried persons living together,
whether or not they engage in sexual activity. Contracts
expressly providing for the performance of sexual acts,
of course, have been characterized as meretricious and
held unenforceable as violative of public policy. E.g.,
*Hill* v. *Estate of Westbrook,* 95 Cal. App. 2d 599, 602,
213 P.2d 727 (1950); *Wallace* v. *Rappleye,* 103 Ill. 229,

249 (1882); *Gauthier* v. *Laing,* 96 N.H. 80, 84–85, 70 A.2d 207 (1950). "[T]he nonenforceability of agreements expressly providing for meretricious conduct rested upon the fact that such conduct, as the word suggests, pertained to and encompassed prostitution. To equate the nonmarital relationship of today to such a subject matter is to do violence to an accepted and wholly different practice." *Marvin* v. *Marvin,* 18 Cal. 3d 660, 683, 557 P.2d 106, 134 Cal. Rptr. 815 (1976). In accordance with contemporary mores, our criminal statutes have been revised to decriminalize sexual activities between unmarried consenting adults not involving prostitution. General Statutes §§ 53a-65 through 53a-90. There is no longer, therefore, any basis for imposing civil sanctions for such behavior or for failing to recognize that contractual rights may develop in the course of a cohabitation that includes a sexual relationship just as they may arise between parties inhabiting the same household without any such relationship.[4]

We agree with the view set forth in *Marvin* v. *Marvin,* supra, 665, that "[t]he courts should enforce express contracts between nonmarital partners except to the extent that the contract is explicitly founded on the consideration of meretricious sexual services. . . . In the absence of an express contract, the courts should

---

[4] It has been noted that "[a]lthough fornication or cohabitation still violates the criminal law of a number of states, this has not caused contemporary courts to consider cohabitation contracts unenforceable. For example, in *Tyranski* v. *Piggins,* [44 Mich. App. 570, 205 N.W.2d 595 (1973)], even though 'lewd and lascivious cohabitation' was a crime, the court held that the cohabitation relationship did not violate the public policy of the state, since the relationship resembled a normal family relationship. [Id., 573–74.] Similarly, the Wisconsin Supreme Court recently found cohabitation contracts enforceable, even though cohabitation remains a crime in Wisconsin. [*In Matter of Estate of Steffes,* 95 Wis. 2d 490, 290 N.W.2d 697 (1980).]" J. Oldham & D. Caudill, "A Reconnaisance of Public Policy Restrictions upon Enforcement of Contracts between Cohabitants," 18 Fam. L.Q. 93, 128 (1984).

inquire into the conduct of the parties to determine whether that conduct demonstrates an implied contract, agreement of partnership or joint venture, or some other tacit understanding between the parties. The courts may also employ the doctrine of quantum meruit, or equitable remedies such as constructive or resulting trusts, when warranted by the facts of the case."

The decided trend among commentators and courts that have found an agreement between unmarried cohabitants is to endorse the enforcement of such agreement. See *Levar* v. *Elkins,* 604 P.2d 602 (Alaska 1980); *Poe* v. *Estate of Levy,* 411 So. 2d 253 (Fla. App. 1982); *Artiss* v. *Artiss,* 8 Fam. L. Rptr. (BNA) 2313 (Hawaii 1982); *Glasgo* v. *Glasgo,* 410 N.E.2d 1325 (Ind. App. 1980); *Donovan* v. *Scuderi,* 51 Md. App. 217, 443 A.2d 121 (1982); *Carnes* v. *Sheldon,* 109 Mich. App. 204, 311 N.W.2d 747 (1981); *Carlson* v. *Olson,* 256 N.W.2d 249 (Minn. 1977); *Kinkenon* v. *Hue,* 207 Neb. 698, 301 N.W.2d 77 (1981); *Joan S.* v. *John S.,* 121 N.H. 96, 427 A.2d 498 (1981); *Kozlowski* v. *Kozlowski,* 80 N.J. 378, 403 A.2d 902 (1979); *Dominguez* v. *Cruz,* 95 N.M. 1, 617 P.2d 1322 (1980); *Morone* v. *Morone,* 50 N.Y.2d 481, 407 N.E.2d 438, 429 N.Y.S.2d 592 (1980); *Beal* v. *Beal,* 282 Or. 115, 577 P.2d 507 (1978); *Mullen* v. *Suchko,* 279 Pa. Super. 499, 421 A.2d 310 (1980); *In re Estate of Thornton,* 81 Wash. 2d 72, 499 P.2d 864 (1972); *In Matter of Estate of Steffes,* 95 Wis. 2d 490, 290 N.W.2d 697 (1980); *Kinnison* v. *Kinnison,* 627 P.2d 594 (Wyo. 1981); see also M. Glendon, The New Family and the New Property (1981); G. Douthwaite, Unmarried Couples and the Law (1979); G. Blumberg, "Cohabitation Without Marriage: A Different Perspective," 28 U.C.L.A. L. Rev. 1125 (1981); C. Bruch, "Property Rights of De Facto Spouses Including Thoughts on the Value of Homemakers' Services," 10 Fam. L.Q. 101 (1976); R. Casad, "Unmarried Couples and Unjust

Enrichment: From Status to Contract and Back Again?"
77 Mich. L. Rev. 47 (1978); H. Folberg & W. Buren,
"Domestic Partnership: A Proposal for Dividing the
Property of Unmarried Families," 12 Willamette L.J.
453 (1976); H. Kay & C. Amyx, *"Marvin* v. *Marvin:*
Preserving the Options," 65 Calif. L. Rev. 937 (1977);
J. Oldham & D. Caudill, "A Reconnaissance of Public
Policy Restrictions Upon Enforcement of Contracts
between Cohabitants," 18 Fam. L.Q. 93 (1984).

We conclude that our public policy does not prevent
the enforcement of agreements regarding property
rights between unmarried cohabitants in a sexual rela-
tionship. To the extent that the existence of such a rela-
tionship between the parties may have been the basis
for the referee's conclusion that no enforceable con-
tract resulted from their agreement to share, we reject
that conclusion. Finding no support for the denial of
the plaintiff's claims in such notions of public policy as
the referee's memorandum suggests, we are faced, on
the one hand, with his finding that the parties agreed
"by their conduct and/or words to share their earnings
and the fruits of their joint labor," and, on the other
hand, with his conclusion that the evidence provided
insufficient proof of a contract. We view this conclu-
sion as wholly inconsistent with the finding of an agree-
ment, and thus discern no theory upon which to salvage
the judgment rendered below.

There is error, the judgment is set aside and a new
trial is ordered.

In this opinion the other justices concurred.