GLEN ROSENGARTEN *v.* PETER DOWNES
(AC 22253)

Foti, Flynn and Dupont, Js.

Argued March 28—officially released July 30, 2002

*Gary I. Cohen,* for the appellant (plaintiff).

*Opinion*

FLYNN, J. This is an appeal from the trial court's judgment dismissing an action to dissolve a same sex civil union for lack of subject matter jurisdiction, which union the plaintiff, Glen Rosengarten, claims was entered into with the defendant, Peter Downes, in Vermont, pursuant to Vt. Stat. Ann. tit. 15, § 1201 et seq. (2001).[1] Service of process on the defendant, who appar-

---

[1] Section 1202 of title 15 of the Vermont Statutes Annotated provides: "For a civil union to be established in Vermont, it shall be necessary that the parties to a civil union satisfy all of the following criteria:

"(1) Not be a party to another civil union or a marriage.

"(2) Be of the same sex and therefore excluded from the marriage laws of this state.

"(3) Meet the criteria and obligations set forth in 18 V.S.A. chapter 106."

ently resides in New York, was accomplished by certified mail in accordance with an order of notice. The trial court dismissed the action because it concluded that General Statutes § 46b-1 and Practice Book § 25-2 grant powers to the Superior Court to hear and decide actions for dissolution of marriages between a man and a woman, and the Vermont civil union did not fall into the category of other family relations matters set out in General Statutes § 46b-1 (17).

The court determined that it was not empowered with " 'plenary and general subject matter' jurisdiction," much less the ability to exercise its broad statutory equitable powers to dissolve a civil union. On appeal, the plaintiff does not claim that the civil union may be dissolved as a marriage. Instead, he claims that the trial court improperly sua sponte dismissed the action for lack of subject matter jurisdiction because § 46b-1 (17) grants the Superior Court subject matter jurisdiction over "all such other matters within the jurisdiction of the Superior Court concerning children or family relations as may be determined by the judges of said court" and that the dissolution of a Vermont civil union is a matter relating to family relations. The plaintiff further claims that principles of full faith and credit demand that Connecticut recognize civil unions entered into under the laws of Vermont, and thereby the right to dissolve them in a Connecticut forum, because Connecticut has a public policy in favor of recognizing civil unions and, therefore, the court improperly dismissed this action seeking a dissolution of such a union for lack of subject matter jurisdiction. We affirm the judgment of the trial court.

The following facts and procedural history are relevant to our resolution of this appeal. The plaintiff commenced this action by writ of summons and complaint, dated July 11, 2001. The complaint alleged that the plaintiff and the defendant were joined in a civil union

in Vermont on December 31, 2000, pursuant to the statutes of the state of Vermont, that the civil union had broken down irretrievably and that the plaintiff had resided in Connecticut for at least one year preceding the commencement of the action. Pursuant to the complaint, the plaintiff sought "[a]n order dissolving the civil union of the parties" and "[s]uch other and further relief to which the Plaintiff may be entitled in law or equity." Without holding a hearing, the court ordered the action dismissed on August 8, 2001, holding: "There is no subject matter jurisdiction under § 46b-1, and the matter is hereby dismissed sua sponte pursuant to § 25-14 of the Connecticut Practice Book." Practice Book § 25-14 provides: "Any claim of lack of jurisdiction over the subject matter cannot be waived; and whenever it is found after suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the judicial authority shall dismiss the action." See also *Figueroa* v. *C & S Ball Bearing*, 237 Conn. 1, 4–5, 675 A.2d 845 (1996). This appeal followed. At the time of the dismissal, the defendant had not filed an appearance in the trial court and he has not filed an appearance in this appeal.

On February 25, 2002, this court issued two orders. First, we ordered the parties to file supplemental briefs addressing the following issue: "Was it plain error for the trial court to dismiss this action without notice and a hearing, and should the dismissal be reversed accordingly, with an order directing the trial court to hold a hearing to determine whether it has jurisdiction over this matter?" The only responsive brief filed was that of the plaintiff, who argued that the trial court could raise the issue of subject matter jurisdiction sua sponte and that no hearing was necessary because jurisdictional facts were not in dispute, citing our holding in *Pinchbeck* v. *Dept. of Public Health*, 65 Conn. App. 201, 782 A.2d 242, cert. denied, 258 Conn. 928, 783 A.2d

1029 (2001). The plaintiff argued in his brief that "[t]here was simply nothing that any testimony regarding the plaintiff's claim for relief, i.e., dissolution of civil union, could have added to the court's understanding of the jurisdictional issue: Does the Connecticut Superior Court have subject matter jurisdiction in this case, a complaint for dissolution of a civil union, a matter which concerns 'family relations matters'?" The plaintiff did not mention his second prayer for relief, which requested that the court grant any other "relief to which the Plaintiff may be entitled in law or equity."

We agree with the plaintiff that under *Pinchbeck* v. *Dept. of Public Health*, supra, 65 Conn. App. 201, the court did not need to hold an evidentiary hearing to aid in determining whether it had jurisdiction to dissolve a civil union. "When issues of fact are necessary to the determination of a court's jurisdiction, due process requires that a trial-like hearing be held, in which an opportunity is provided to present evidence and to cross-examine adverse witnesses." *Standard Tallow Corp.* v. *Jowdy*, 190 Conn. 48, 56, 459 A.2d 503 (1983). In *Pinchbeck*, however, we explained that "[i]n the absence of any disputed facts pertaining to jurisdiction, a court is not obligated to hold an evidentiary hearing before dismissing an action for lack of jurisdiction." *Pinchbeck* v. *Dept. of Public Health*, supra, 209.

In the present case, there are no factual issues in dispute, and the factual record before us, though sparse, is sufficient to determine whether there is jurisdiction to dissolve the plaintiff's Vermont civil union. There is nothing in the complaint to indicate that both parties to the purported union are of the same sex, and no evidence was taken on that issue. However, § 1201 (2) of title 15 of the Vermont Statutes Annotated provides: " 'Civil Union' means that two eligible persons have established a relationship pursuant to this chapter, and may receive the benefits and protections and be subject

to the responsibilities of spouses." Section 1202 (2) of title 15 of the Vermont Statutes Annotated provides that parties to a civil union must "[b]e of the same sex and therefore excluded from the marriage laws" of Vermont. In Vermont, pursuant to § 1201 (4), marriage is defined as "the legally recognized union of one man and one woman." Vt. Stat. Ann. tit. 15, § 1201 (4). Although not specifically pleaded, it is therefore clear from the complaint that the civil union described is between two persons of the same sex. We conclude that the record before the trial court was adequate for it to make a determination as to whether it had jurisdiction to dissolve a civil union and, therefore, it was unnecessary for the court to conduct an evidentiary hearing.

Second, we ordered the trial court to articulate, in a memorandum of decision, its reasons for dismissing the matter for lack of subject matter jurisdiction. In its articulation dated March 4, 2002, the court again noted that it had dismissed the matter for lack of jurisdiction pursuant to § 46b-1. The court explained that although the plaintiff had denominated the case a family relations matter by using a judicial branch code, "F00," on the summons, neither § 46b-1, the statutory provision that defines the family relations matters within the jurisdiction of the Superior Court, nor Practice Book § 25-1,[2]

---

[2] Practice Book § 25-1, entitled "Definitions Applicable to Proceedings on Family Matters," provides: "The following shall be 'family matters' within the scope of these rules: Any actions brought pursuant to General Statutes § 46b-1, including but not limited to dissolution of marriage, legal separation, dissolution of marriage after legal separation, annulment of marriage, alimony, support, custody, and change of name incident to dissolution of marriage, habeas corpus and other proceedings to determine the custody and visitation of children except those which are properly filed in the superior court as juvenile matters, the establishing of paternity, enforcement of foreign matrimonial judgments, actions related to prenuptial and separation agreements and to matrimonial decrees of a foreign jurisdiction, actions brought pursuant to General Statutes § 46b-15, custody proceedings brought under the provisions of the Uniform Child Custody Jurisdiction Act and proceedings for enforcement of support brought under the provisions of the Uniform Interstate Family Support Act."

which provides that family matters within the scope of the rules are those actions brought pursuant to § 46b-1, mentions the court's power to dissolve civil unions. The court held that "[m]atters such as this which implicate significant issues of public policy are more properly within the domain of the legislature . . . [and] [a]s such, the legislature of a sister state cannot, in effect, make such a determination for the people of Connecticut." In support of this conclusion, the court relied on General Statutes § 45a-727a (4), which provides that "the current public policy of the state of Connecticut is now limited to a marriage between a man and a woman." It also relied on the Defense of Marriage Act, Pub. L. No. 104-199, § 2 (a), 110 Stat. 2419, codified at 28 U.S.C. § 1738C. It observed that title 28 of the United States Code, § 1738C, provides: "No State, territory, or possession of the United States, or Indian tribe, shall be required to give effect to any public act, record, or judicial proceeding of any other State, territory, possession, or tribe respecting a relationship between persons of the same sex that is treated as a marriage under the laws of such other State, territory, possession, or tribe, or a right or claim arising from such relationship."

The issue raised by the trial court's dismissal of the action involves questions about the exercise of subject matter jurisdiction over foreign civil unions. In suggesting that jurisdiction may be found under subdivision 17 of § 46b-1, the plaintiff himself recognizes the difficulty of fitting his claim for relief under subdivision (1) of § 46b-1. Section 46b-1 provides in relevant part: "Matters within the jurisdiction of the Superior Court deemed to be family relations matters shall be matters affecting or involving: (1) Dissolution of marriage . . . ." Clearly this civil union is not a marriage recognized under § 46b-1 because it was not entered into between a man and a woman. See General Statutes §§ 45a-727a (4) and 46b-21. Nor is it a marriage under

our sister state of Vermont's definition of marriage found in § 1201 (4) of title 15 of the Vermont Statutes Annotated because it too limits the definition of marriage to those entered between "one man and one woman."

The court held that because the dissolution of a civil union was not a family relations matter as set forth in either § 46b-1 or Practice Book § 25-1, it lacked subject matter jurisdiction to dissolve such a union and was, therefore, required to dismiss the plaintiff's action. In his appeal to this court, the plaintiff challenges the validity of the trial court's construction of § 46b-1. He contends that jurisdiction was vested in the court by § 46b-1, which provides in pertinent part that "[m]atters within the jurisdiction of the Superior Court deemed to be family relations matters shall be matters affecting or involving . . . (17) all such other matters within the jurisdiction of the Superior Court concerning children or family relations as may be determined by the judges of said court." Thus, the court's determination that it lacked subject matter jurisdiction turned on its construction of § 46b-1.

Because statutory construction raises an issue of law, our review is plenary. *Alvarado* v. *Black*, 248 Conn. 409, 414, 728 A.2d 500 (1999); *Davis* v. *Norwich*, 232 Conn. 311, 317, 654 A.2d 1221 (1995). The scope of our plenary review is governed by well established principles. "It is axiomatic that the process of statutory interpretation involves a reasoned search for the intention of the legislature. . . . In seeking to discern that intent, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." (Citations omitted; internal quotation marks omit-

ted.) *Giaimo* v. *New Haven*, 257 Conn. 481, 493, 778 A.2d 33 (2001).

Implicit in the plaintiff's argument that jurisdiction exists under § 46b-1 (17) is that we must recognize the validity of the Vermont civil union as a matter concerning family relations. If Connecticut does not recognize the validity of such a union, then there is no res to address and dissolve.

We begin our construction of § 46b-1 by first examining the text of the statute itself. Section 46b-1 provides: "Matters within the jurisdiction of the Superior Court deemed to be family relations matters shall be matters affecting or involving: (1) Dissolution of marriage . . . (2) legal separation; (3) annulment of marriage; (4) alimony, support, custody and change of name incident to dissolution of marriage, legal separation and annulment; (5) actions brought under section 46b-15;[3] (6) complaints for change of name; (7) civil support obligations; (8) habeas corpus and other proceedings to determine the custody and visitation of children; (9) habeas corpus brought by or in behalf of any mentally ill person except a person charged with a criminal offense; (10) appointment of a commission to inquire whether a person is wrongfully confined as provided by section 17a-523;[4] (11) juvenile matters as provided in section 46b-

---

[3] General Statutes § 46b-15 (a) provides: "Any family or household member as defined in section 46b-38a who has been subjected to a continuous threat of present physical pain or physical injury by another family or household member or person in, or has recently been in, a dating relationship who has been subjected to a continuous threat of present physical pain or physical injury by the other person in such relationship may make an application to the Superior Court for relief under this section."

[4] General Statutes § 17a-523 provides: "Any judge of the Superior Court, on information to him that any person is unjustly deprived of his liberty by being detained or confined in any hospital for psychiatric disabilities, or in any place for the detention or confinement of persons with psychiatric disabilities, or in custody and control of any individual under an order of a court of probate, may appoint a commission of not fewer than two persons, who, at a time and place appointed by them, shall hear any evidence offered touching the case. Such commission need not summon the party claimed

121; (12) all rights and remedies provided for in chapter 815j;[5] (13) the establishing of paternity; (14) appeals from probate concerning: (a) Adoption or termination of parental rights; (b) appointment and removal of guardians; (c) custody of a minor child; (d) appointment and removal of conservators; (e) orders for custody of any child; (f) orders of commitment of persons to public and private institutions and to other appropriate facilities as provided by statute; (15) actions related to prenuptial and separation agreements and to matrimonial decrees of a foreign jurisdiction; (16) custody proceeding brought under the provisions of chapter 815o; and (17) all such other matters within the jurisdiction of the Superior Court concerning children or family relations as may be determined by the judges of said court."

Clearly, subdivisions two through sixteen have no applicability to the issues in this case because those subdivisions relate to legal separations; annulments; alimony, support, custody and change of name incident to a dissolution of marriage; relief from physical abuse; changes of name; civil support; habeas corpus and other proceedings to determine custody and visitation of children; habeas corpus petitions brought on behalf of persons with psychiatric disabilities; commissions investigating claims of wrongful confinement; certain juvenile matters; proceedings concerning all rights and

to be unjustly confined before it, but shall have one or more private interviews with him and shall also make inquiries of the physicians and other persons having charge of such place of detention or confinement, and within a reasonable time thereafter report to such judge the facts and its opinion thereon. If, in its opinion, such person is not legally detained or confined in such place, or is cured, or his confinement is no longer beneficial or advisable, such judge shall order his discharge; but no commission shall be appointed with reference to the same person more often than once in six months. The judge before whom any of the proceedings provided for in this section are had may tax reasonable costs at his discretion."

[5] Chapter 815j, comprised of General Statutes §§ 46b-40 through 46b-87a, inclusive, sets out rights and remedies arising from dissolution of marriage, legal separation and annulment.

remedies brought under chapter 815j; paternity matters; appeals from probate concerning: adoption or termination of parental rights, appointment or removal of guardians, custody of minor children, appointment or removal of conservators, orders for custody of any child and orders of commitment to institutions or other statutorily approved facilities; actions related to prenuptial and separation agreements and to matrimonial decrees of foreign jurisdictions; and custody proceedings brought under chapter 815o, the Uniform Child Custody Jurisdiction Act. We note, in passing, that subdivision (12) concerning rights and remedies provided for in chapter 815j is not claimed as a source of jurisdiction by the plaintiff, nor could it be, because it neither confers the right he claims nor does it authorize the remedy he seeks. We also note that subdivision (1) of § 46b-1 defines dissolution of marriage as a family relations matter, but the plaintiff does not claim to have been married either under the laws of the state of Connecticut or the laws of the state of Vermont. Nor does he claim entitlement to relief under that subdivision.

The plaintiff does claim that subdivision (17) of § 46b-1 permits the court to exercise jurisdiction. We first observe that the plain words of § 46b-1 define two categories of family matters. Subdivisions (1) through (16) statutorily define specific kinds of family matters "within the jurisdiction" of the court. Subdivision (17) is a catchall provision "concerning children or family relations" as may be determined by the judges of the Superior Court. The matter before us does not involve children and, therefore, that part of subdivision (17) does not provide a basis for the exercise of jurisdiction. Additionally, the judges of the Superior Court have not enacted any rule of practice that would define foreign civil unions as a family matter either. We therefore find nothing in the text of § 46b-1 (17) or in the rules of the Superior Court pertaining to family matters, Practice

Book §§ 25-1 through 25-69, inclusive, that would support the plaintiff's claim that jurisdiction exists.

We next examine the legislative history of the enactment of subdivision (17) of § 46b-1, the statutory provision relied on by the plaintiff in this appeal, and the legislative policy it was designed to implement. During the Senate proceedings, it was noted that the reason for the enactment of § 46b-1 (17), which was part of the court merger bill of the Connecticut Court of Common Pleas and the Superior Court, was to eliminate the waste of judicial personnel caused by "ill-defined jurisdictional lines causing duplication of efforts" and "to provide for the unification, simplification, flexibility and effective responsible control of the administration of the courts of the state of Connecticut." 19 S. Proc., Pt. 7, 1976 Sess., p. 2652, remarks of Senator David H. Neiditz. Our review of the legislative history of § 46b-1 revealed nothing that would support the plaintiff's expansive interpretation of § 46b-1 (17). Instead, its obvious intent was to collect all matters that had previously been divided between the old Common Pleas Court and the old Superior Court, into the newly merged Superior Court.

Finally, we examine the provisions of § 46b-1 (17) in relationship with existing legislation and common-law principles to determine whether the recognition of civil unions and the corresponding right to dissolve such unions was contemplated as a family relations matter by our legislature. General Statutes §§ 45a-727b and 46a-81r, both of which are discussed in greater detail later in this opinion, expressly state that Connecticut does not endorse or authorize, respectively, civil unions or any other relationship between unmarried persons. On the basis of these enactments, we conclude that because the legislature expressly refused to endorse or authorize such unions it could not have intended civil

unions to be treated as family matters within the jurisdiction of the Superior Court pursuant to § 46b-1 (17).

Moreover, common-law principles left the issue about who might marry generally to the ecclesiastical courts. See 1 W. Blackstone, Commentaries on the Laws of England (5th Ed. 1773) p. 453. It is plain from a reading of Blackstone, who speaks of husband and wife, and his discussion of the common law as applied to husband and wife, that by using terms like husband and wife or, its Norman French equivalent, baron and feme, the understanding of English common law was that marriage was a contract entered into by a man and a woman. Id., 453, 457. Judge Swift, in his discussion of the common law of Connecticut regarding rights arising out of marital status, makes clear that this legal relation contemplated a contract made between a man and a woman. 1 Z. Swift, A Digest of the Laws of the State of Connecticut (1822) p. 18. This is also clear when one reads Judge Swift's discussion of limitations on marriage within certain degrees of kindred, which are prohibited on the ground "that such incestuous connection is repugnant to the law of nature." Id., p. 19. The examples he gives are all of men then unable to marry women of various degrees of kindred. Id.

In determining that the legislative intent in the adoption of subdivision (17) of § 46b-1 was not to make Connecticut courts a forum for same sex, foreign civil unions, we, therefore, conclude that the text itself, the rules of court, the legislative history, the strong legislative policy against permitting same sex marriages and the relationship between other statutes, legislative enactments of state policy and the common law are all in accord with that view.

We note that the court based its determination that it lacked jurisdiction to dissolve a civil union, in part, on its conclusion that the Vermont legislature cannot

legislate for the people of Connecticut. We agree with the court that the statutes of Vermont do not have extraterritorial effect; see *Olmsted* v. *Olmsted,* 216 U.S. 386, 395, 30 S. Ct. 292, 54 L. Ed. 530 (1910); and analyze this full faith and credit claim.

The constitution of the United States, article four, § 1, requires that: "Full faith and credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State. . . ." "[W]here statute or policy of the forum State is set up as a defense to a suit brought under the statute of another State . . . the conflict is to be resolved, not by giving automatic effect to the full faith and credit clause and thus compelling courts of each State to subordinate its own statutes to those of others but by *appraising the governmental interest of each jurisdiction and deciding accordingly.* That is, the full faith and credit clause, in its design to transform the States from independent sovereigns into a single unified Nation, directs that a State, when acting as the forum for litigation having multistate aspects or implications, respect the legitimate interests of other States and avoid infringement upon their sovereignty, but because the forum State is also a sovereign in its own right, in appropriate cases it may attach paramount importance to its own legitimate interests. The clause (and the comparable due process clause standards) obligate *the forum State to take jurisdiction and to apply foreign law, subject to the forum's own interest in furthering its public policy. In order 'for a State's substantive law to be selected in a constitutionally permissible manner, that State must have a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair.'* " (Emphasis added.) Congressional Research Service, Library of Congress, The Constitution of the United States of America, Analysis and Interpretation (J. Kil-

lian & G. Costello eds. 1996) art. IV, § 1, pp. 855–56, citing *Allstate Ins. Co.* v. *Hague*, 449 U.S. 302, 101 S. Ct. 633, 66 L. Ed. 2d 521 (1981); *Nevada* v. *Hall*, 440 U.S. 410, 99 S. Ct. 1182, 59 L. Ed. 2d 416 (1979); *Carroll* v. *Lanza*, 349 U.S. 408, 75 S. Ct. 804, 99 L. Ed. 1183 (1955); *Alaska Packers Assn.* v. *Industrial Accident Commission*, 294 U.S. 532, 55 S. Ct. 518, 79 L. Ed. 1044 (1935).

We conclude that the plaintiff in the present case has a significant set of contacts with this state because he is a resident of Connecticut and has chosen a Connecticut court as the forum in which he seeks the dissolution of this civil union. The only record before us, based on the plaintiff's pleadings, is that, other than having entered the civil union in Vermont, neither party to the civil union has any other significant contact with that state.

The plaintiff contends, "Connecticut public policy clearly favors the conclusion that the Superior Court has subject matter jurisdiction to dissolve the civil union entered into in Vermont." He claims that principles of full faith and credit demand that Connecticut recognize Vermont's civil union statutes unless recognition would violate some strong public policy of Connecticut. He further claims that Connecticut does not have a strong public policy against recognition of civil unions but, instead, that Connecticut public policy favors the recognition of civil unions and the right to dissolve them. We disagree. We conclude that Connecticut public policy does not support that conclusion.[6]

___

[6] We note that our legislature has recently had the opportunity to authorize same sex marriages and civil unions and has not done so. On February 6, 2002, House Bill No. 5001, which would have authorized two persons to enter into marriage regardless of sex, and House Bill No. 5002, which would have authorized the establishment of civil unions and granted the parties to a civil union the same benefits, protections and responsibilities as granted to spouses in a marriage, were referred to the judiciary committee. A public hearing on that proposed legislation was held on February 11, 2002. No action was taken, and the bills died in committee.

The plaintiff first points to General Statutes §§ 46a-81a through 46a-81r, which prohibit discrimination on the basis of sexual orientation as evidence of Connecticut's clear public policy in favor of recognizing the right of homosexuals to enter into a marriage-like relationship and the corresponding right to dissolve such relationships in Connecticut courts. He claims that, in keeping with Connecticut's public policy prohibiting discrimination based on sexual orientation, we should extend to homosexual citizens of this state all of the same relief we extend to heterosexual citizens when dissolving a marriage or marriage-like relationship. We disagree that the statutory sections cited by the plaintiff support his position that Connecticut has a clear public policy in favor of the recognition of the right to enter same sex unions or the right to dissolve them in the Superior Court.

General Statutes § 46a-81r, one of the sections of title 46a on which the plaintiff relies, provides in relevant part: "Nothing in sections . . . 46a-81a to 46a-81q, inclusive . . . shall be . . . construed . . . (1) to mean the state of Connecticut condones homosexuality or bisexuality or any equivalent lifestyle . . . (4) to authorize the recognition of or the right of marriage between persons of the same sex, or (5) to establish sexual orientation as a specific and separate cultural classification in society."

One of the sources of law is custom and tradition.[7] When § 46a-81r, on which the plaintiff relies, clearly

---

[7] Blackstone wrote: "Some have divided the common law into two principal grounds or foundations: 1. Established customs . . . and 2. Established rules and maxims . . . . But I take these to be one and the same thing. For the authority of these maxims rests entirely upon general reception and usage; and the only method of proving, that this or that maxim is a rule of the common law, is by shewing that it hath been always the custom to observe it." 1 W. Blackstone, supra, p. 68.

states that "[n]othing in sections . . . 46a-81a through 46a-81q . . . shall be . . . construed . . . to authorize . . . the right of marriage between persons of the same sex," we fail to see how those sections, embodying custom, require Connecticut to provide a forum for recognition and dissolution of a same sex civil union that our law does not authorize.[8] The trial court was entitled to rely on statutes based on that customary source of our law. It does not constitute invidious discrimination simply because a state places some restraints on who may marry. For example, some societies allow polygamous marriages,[9] but Connecticut does not allow such marriages[10] and neither does Vermont.[11] Connecticut has exercised the power to limit by law who may marry since the beginning of the colony. Other than to cite title 46a, which we conclude stands for the opposite proposition of that for which he argues, the plaintiff has failed to brief the issue of the Connecticut legislature's power to restrict the right to marry or enter

---

[8] "Marriage, as creating the most important relation in life, as having more to do with the morals and civilization of a people than any other institution, has always been subject to the control of the Legislature. That body prescribes the age at which parties may contract to marry, the procedure or form essential to constitute marriage, the duties and obligations it creates, its effects upon the property rights of both, present and prospective, and the acts which may constitute grounds for its dissolution." *Maynard* v. *Hill*, 125 U.S. 190, 205, 8 S. Ct. 723, 31 L. Ed. 654 (1888).

[9] "At common law, the second marriage was always void . . . and from the earliest history of England polygamy has been treated as an offence against society. After the establishment of the ecclesiastical courts, and until the time of James I., it was punished through the instrumentality of those tribunals, not merely because ecclesiastical rights had been violated, but because upon the separation of the ecclesiastical courts from the civil the ecclesiastical were supposed to be the most appropriate for the trial of matrimonial causes and offences against the rights of marriage; just as they were for testamentary causes and the settlement of the estates of deceased persons." (Citation omitted.) *Reynolds* v. *United States*, 98 U.S. 145, 164–65, 25 L. Ed. 244 (1878).

[10] See General Statutes § 53a-190 (c), which makes bigamy a class D felony.

[11] See Vt. Stat. Ann. tit. 15, § 5, declaring bigamous marriages "null and void for all purposes," and Vt. Stat. Ann. tit. 13, § 206, which provides that a person who commits the offense of bigamy "shall be imprisoned not more than five years."

into marriage-like relationships in terms of discrimination based on sexual orientation. Accordingly, we conclude that §§ 46a-81a through 46a-81r do not evidence a clear public policy in favor of recognizing same sex civil unions or the right to dissolve them.

The plaintiff next claims that the Connecticut legislature has evinced a willingness to recognize civil unions both by recently amending the adoption laws, found in General Statutes §§ 45a-724 through 45a-737, inclusive, to allow adoptions by same sex partners and by its refusal to enact its own version of the Defense of Marriage Act. Again, we disagree.

General Statutes § 45a-727a, entitled "State policy re best interests of child; public policy re marriage," is a clear statement of public policy embodied in a statute which should be enforced and upheld despite contrary statutory enactments in the state of Vermont. See General Statutes § 45a-727a (4).

Although our General Assembly has on occasion adopted preambles to some of the enactments, it is not the usual case. However, there have been statutory enactments in which the legislature has expressly stated a particular policy. See, e.g., General Statutes §§ 22a-91 and 22a-92 (a) of the Coastal Management Act. Section 45a-727a of the General Statutes is unusual in that it is completely devoted to a declaration of legislative policy. Subdivision (4) of § 45a-727a provides: "It is further found that the current public policy of the state of Connecticut is now limited to a marriage between a man and a woman."

The legislative history of the enactment of § 45a-727a shows that members of the General Assembly were initially reacting to what had become known as the *In re Baby Z.* case. *In re Baby Z.*, 247 Conn. 474, 724 A.2d 1035 (1999). The court in *In re Baby Z.* held that General Statutes § 45a-727 of our then existing adoption laws

did not permit a child with a natural or adoptive legal parent to be adopted by a second person other than that parent's spouse. *In re Baby Z.*, supra, 498–522. In response to the decision in *In re Baby Z.*, the General Assembly enacted No. 00-228 of the 2000 Public Acts. In speaking against a proposed amendment to House Bill 5830, which ultimately passed without the amendment and became Public Act 00-228 and which amendment he found unnecessary, Senator Donald Williams, the Senate chair of the judiciary committee, in floor debate said that what some had termed the "gay adoption" bill did "not change our policy on marriage in the state of Connecticut." 43 S. Proc., Pt. 8, 2000 Sess., pp. 2456–57. In floor debate, he stated that the bill had "protections" which made that "absolutely clear." Id., p. 2457. He pointed to § 1 of the bill, stating that "it is further found that the current public policy of the State of Connecticut is now limited to a marriage between a man and a woman." Id. He also pointed to the last section of the bill, § 5, which provided that "nothing in this act shall be construed to establish or constitute an endorsement of any public policy with respect to marriage, civil union or any other form of relation between unmarried persons or with respect to any rights of or between such persons other than their rights and responsibilities to a child who is the subject of an adoption." Id.

It becomes clear from a careful reading of the floor debate on this legislation in both houses, that a number of legislators were opposed to adoption of this legislation if it were to be used later in any way as a wedge by appellate or trial courts to require recognition of civil unions in Connecticut in the manner they ascribed to the Vermont Supreme Court in *Baker* v. *State*, 170 Vt. 194, 744 A.2d 864 (1999). Members of the General Assembly in their floor debate in each house did not make explicit mention of *Baker*. It is clear, however,

that several legislators were concerned, as a result of the Vermont experience, that in overriding the ruling in the *In re Baby Z.* case by permitting adoption of a child who already had a natural or adoptive parent by another person of the same sex who was not lawfully married to that parent, they did not allow an appellate court to use that legislative enactment as a wedge to bring down the laws of Connecticut concerning who may marry. See, e.g., 43 S. Proc., supra, pp. 2451–52. The *Baker* court had done just that by citing the Vermont legislature's enactment of a same sex couple adoption law as one of the reasons why there was no proper governmental purpose under the common benefits clause of the Vermont constitution to restrict marriage to unions between a man and a woman. *Baker* v. *State*, supra, 218–19. After discussing what it termed the "reality" that some persons in same sex relationships were conceiving children by artificial means, the Vermont court so used the enactment by the Vermont legislature of that change in the law when it stated: "The Vermont Legislature has not only recognized this reality, but has acted affirmatively to remove legal barriers so that same-sex couples may legally adopt and rear the children conceived through such efforts. See 15A V.S.A. § 1-102 (b) (allowing partner of biological parent to adopt if in child's best interest without reference to sex)." *Baker* v. *State*, supra, 218.

In the debate on the adoption of General Statutes §§ 45a-727a and 45a-727b, in answer to pointed questions from Senator Winthrop Smith, Senator Williams agreed that (1) the "finding of fact" at the beginning of the bill is a statement of public policy of the state of Connecticut and was established as such by its placement in the statutes and not through a legislative dialogue; 43 S. Proc., supra, p. 2472; (2) the language on lines eleven through thirteen in the bill establishes that the public policy of Connecticut is that a marriage is

defined as being between one man and one woman; id., p. 2473; (3) after a legislature has established and recognized a policy like this that a court could not alter that policy without the legislature first making a change; id.; and (4) the language of the bill precluded a court from reaching a conclusion that Connecticut public policy would allow same sex marriages or unions. Id., pp. 2474–75.

In addition, contrary to the plaintiff's assertions, the legislative history reveals that the legislature failed to enact its own version of the Defense of Marriage Act not because it intended to evince a willingness to recognize civil unions, but because it thought such an enactment unnecessary. During the Senate debate, the following colloquy took place between Senators Smith and Williams. Senator Smith asked: "This amendment is the one that we've been calling DOMA, the [D]efens[e] [of] [M]arriage [A]ct, and based on the language we've just talked about in the underlying bill and the questions that we've just had, my question to you was, would the addition of this to the bill in front of us now be superfluous?" 43 S. Proc., supra, p. 2476. Senator Williams responded: "Exactly. I believe that this amendment would be superfluous." Id. Furthermore, § 5 of Public Act 00-228, now codified at § 45a-727b, expressly provides: "Nothing in this section and sections 45a-724, 45a-727, 45a-727a and 45a-731 shall be construed to establish or constitute an endorsement of any public policy with respect to marriage, civil union or any other form of relation between unmarried persons or with respect to any rights of or between such persons other than their rights and responsibilities to a child who is a subject of an adoption as provided for in sections 45a-724 and 45a-727." We therefore conclude that the Connecticut legislature has not demonstrated a willingness to recognize civil unions by either its amendment of the adoption statutes or by its failure to enact its own version of the Defense of Marriage Act.

Finally, the plaintiff relies on *Boland* v. *Catalano*, 202 Conn. 333, 521 A.2d 142 (1987), in support of his argument that Connecticut recognizes nontraditional relationships and affords the parties to such relationships a judicial remedy for the dissolution of those relationships. Specifically, he argues that under *Boland* this court can offer dissolution relief to the parties of this civil union under the theory that the partners to the union entered into an express contract, the terms of which are defined by § 1201 et seq. of title 15 of the Vermont Statutes Annotated. We disagree for the reasons already stated and because the plaintiff did not plead any express or implied contract to share earnings or assets.

In his second claim for relief, the plaintiff sought any relief to which he may be entitled in law or equity. If under any facts provable under a complaint, a court of law has jurisdiction to grant any one of the claims for relief set out in a plaintiff's complaint, then the plaintiff's action should not be dismissed sua sponte for lack of jurisdiction. See *Pamela B.* v. *Ment*, 244 Conn. 296, 308, 709 A.2d 1089 (1998). In *Boland*, our Supreme Court adopted the holding of the California Supreme Court in *Marvin* v. *Marvin*, 18 Cal. 3d 660, 665, 557 P.2d 106, 134 Cal. Rptr. 815 (1976), that "[t]he courts should enforce express contracts between nonmarital partners except to the extent that the contract is explicitly founded on the consideration of meretricious sexual services. . . . In the absence of an express contract, the courts should inquire into the conduct of the parties to determine whether that conduct demonstrates an implied contract, agreement of partnership or joint venture, or some other tacit understanding between the parties." (Internal quotation marks omitted.) *Boland* v. *Catalano*, supra, 202 Conn. 340–41. The *Boland* court also expressly ruled, in adopting *Marvin*, that the court may also employ "equitable remedies" when warranted

by the facts of the case. Id., 341. If before or during purportedly entering the Vermont civil union, the parties to this action entered an implied or express contract to "share their earnings and the fruits of their joint labor," the court had jurisdiction to grant relief in law or equity as to that claim. Id., 342. "Ordinary contract principles are not suspended . . . for unmarried persons living together, whether or not they engage in sexual activity." Id., 339.

In evaluating whether the complaint here permits jurisdiction to be exercised on the second claim for relief, we do not evaluate what agreements, if any, the plaintiff and defendant entered, explicitly or implicitly, regarding the sharing of assets or income of one with the other and whether such agreements are enforceable because, unlike *Marvin* v. *Marvin*, supra, 18 Cal. 3d 660, and *Boland* v. *Catalano*, supra, 202 Conn. 333, no such express or implied agreements are alleged in the complaint. Nor has the plaintiff distinctly claimed on appeal that jurisdiction might be exercised on this ground.

Finally, *Boland* is not authority for the proposition that Connecticut must recognize civil unions between same sex partners and provide a forum for their dissolution in the state of Connecticut. "The rights and obligations that attend a valid marriage simply do not arise where the parties choose to cohabit" without entering a valid marriage relationship. Id., 339.

The plaintiff also cites Practice Book § 25-2[12] as further grounds for the exercise of jurisdiction. This provi-

---

[12] Practice Book § 25-2 provides: "(a) Every complaint in a dissolution of marriage, legal separation or annulment action shall state the date and place, including the city or town, of the marriage and the facts necessary to give the court jurisdiction.

"(b) Every such complaint shall also state whether there are minor children issue of the marriage and whether there are any other minor children born to the wife since the date of marriage of the parties, the name and date of birth of each, and the name of any individual or agency presently responsible by virtue of judicial award for the custody or support of any

sion merely sets forth the necessary allegations of a complaint for dissolution of marriage, legal separation or annulment where jurisdiction already exists, but does not confer jurisdiction.

For all of the foregoing reasons, we conclude that a civil union is not a family relations matter and, therefore, the court was correct in determining that it had no subject matter jurisdiction to dissolve the civil union under § 46b-1 (17).

The judgment is affirmed.

In this opinion the other judges concurred.

child. These requirements shall be met whether a child is issue of the marriage or not and whether custody of children is sought in the action. In every case in which the state of Connecticut or any town thereof is contributing or has contributed to the support or maintenance of a party or child of said party, such fact shall be stated in the complaint and a copy thereof served on the attorney general or town clerk in accordance with the provisions of Sections 10-12 through 10-17. Although the attorney general or town clerk shall be a party to such cases, he or she need not be named in the writ of summons or summoned to appear.

"(c) The complaint shall also set forth the plaintiff's demand for relief and the automatic orders as required by Section 25-5."